[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15820

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 15, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-01584-CV-TWT-1

GREGORY L. JENKINS,
Individually and as administrator of the
estate of Hoyt D. Jenkins, deceased,
DARRYL B. JENKINS,
Individually, as the child of
Hoyt D. Jenkins, deceased,
DOUGLAS E. JENKINS,
Individually, as the child of
Hoyt D. Jenkins, deceased,

                                                            Plaintiffs-Appellants,

versus

DEKALB COUNTY, GEORGIA,
VALDIS CULVER,
Individually,
SHANE GILL,
Individually,
FORREST TOWNSEND,
Individually,

                                                            Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Georgia

**(January 15, 2009)**

Before BLACK, PRYOR and COX, Circuit Judges.

PER CURIAM:

This appeal presents the issue whether three officers, Valdis Culver, Shane Gill, and Forrest Townsend, at the jail of DeKalb County, Georgia, were deliberately indifferent to a substantial risk of serious harm to an inmate, Hoyt Jenkins, when the officers placed another inmate, Jason Smith, in Jenkins's cell. Smith beat Jenkins to death on the first night they were cellmates. The district court granted summary judgment in favor of the officers on the basis of qualified immunity because the district court found "no evidence that any of the individual [officers] subjectively believed that such a [substantial risk of serious injury] existed." Hoyt Jenkins's surviving children, Darryl, Gregory, and Douglas Jenkins, appeal the summary judgment. Jenkins's children argue that there is substantial evidence that the officers were aware of a substantial risk of serious harm to Jenkins and that the officers deliberately placed Smith in Jenkins's cell as retaliation for Jenkins's use of racial slurs. We conclude that, even if the officers

were deliberately indifferent to a substantial risk of harm to Jenkins, Jenkins's children have not proved that the officers' indifference caused Jenkins's death. The officers are immune from suit. We affirm.

## I. BACKGROUND

Hoyt Jenkins was an elderly white inmate in the DeKalb County jail. When he arrived at the jail in August 2003, Jenkins was admitted to the Mental Health Infirmary unit of the jail. After Jenkins attacked his cellmate and scratched the man's chest, medical staff evaluated Jenkins and determined that he was unstable and possibly bipolar. Jenkins was involved in a second altercation in September 2003 and hit an officer in the face.

Jenkins was released on bond in late September 2003, but he was back at the jail within two days. Medical staff reassessed Jenkins's mental health and found that he was delusional and paranoid and engaged in violent behavior and made threats. The staff also found that Jenkins "[had] negative attitudes towards African-Americans," "would call people names," and "had a belief system that he was receiving messages from Jesus Christ." The staff determined that Jenkins suffered from schizophrenia, dementia, and possibly Alzheimer's disease, and they placed him in an area of the jail designated for mentally ill inmates, 3 Southwest.

3

Jenkins was involved in other physical altercations. Jenkins had a reputation for being "aggressive" and "start[ing] confrontations" with his cellmates by pulling them off their bunks while they were sleeping. In December 2003, Jenkins was treated for injuries he alleged were inflicted by a guard. Jenkins was admitted to the jail infirmary because he complained of pain in his wrist and leg, was diagnosed with fractures in his wrist and hip, and underwent a surgical procedure at Grady Hospital. Jenkins was discharged from the infirmary in February 2004 and housed with the general population of the jail. After officers expressed concern about Jenkins's presence in the general population, jail staff returned Jenkins to 3 Southwest.

On March 4, 2004, the Superior Court of DeKalb County ordered Sheriff Thomas E. Brown to transfer Jenkins to the Georgia Department of Human Resources at Georgia Regional Hospital-Atlanta. The court entered the order on the basis of a psychological evaluation of Jenkins by Dr. Pamela Eilander, who determined that Jenkins was "delusional, did not appreciate the criminality of the charges against him, and was actively psychotic." The record contains no evidence that the Sheriff ever attempted to comply with this order, and Jenkins remained at the jail until his death in July 2004.

On July 5, 2004, Jason Smith was arrested at a Hardee's restaurant in Decatur, Georgia. Smith called the police and asked them to take him to jail; he said that some people were trying to kill him and voluntarily produced a bag of marijuana. The police arrested Smith, transported him to the DeKalb County Jail, and placed him in a holding cell.

Later that evening, when another inmate, Anthony Gojlewicz, entered the same holding cell, Smith punched him twice and attempted to punch him a third time. Gojlewicz filed a written complaint, and jail staff prepared an incident report. Smith continued to behave combatively after officers separated him from Gojlewicz, and three officers had to restrain him to return him to the holding cell. At 12:16 a.m. on July 6, a notation regarding the incident was placed in the computer database of the jail. The notation was an "enemy alert," which appeared in both Smith's and Gojlewicz's files and showed that each inmate was the other inmate's enemy.

On the morning of July 6, jail staff transported Smith from the holding cell to the intake area for processing. Shortly after arriving in the intake area, perhaps in an attempt to escape from the jail, Smith jumped out of his chair, ran, and jumped on the counter in front of the exit. Four officers, including defendants Gill

and Townsend, restrained and subdued Smith. Townsend prepared a report about the incident, and jail staff informally discussed the incident.

Jail records state that later, on July 6, Gill assigned Smith to the fifth cell in pod 600 of the 3 Southwest area of the jail, 3 SW 605. Townsend escorted Smith from the intake area to pod 600. Culver, who was working security in pod 600, placed Smith in 3 SW 604, Jenkins's cell.

The officers offered different explanations for Smith's placement in cell 604. On July 8, 2004, Gill told investigators from the jail that when he assigned Smith to a cell, he "put him" in cell 604. When the investigators asked why the computer database and the inmate armband that Smith wore showed that Smith was assigned to cell 605, Gill stated that the computer database did not show a space available in cell 604, but the "empty bunk count" that staff generated during each shift showed that there was a space available there. This statement is consistent with Gill's written statement to the investigators, in which he said, "I placed (assigned) Inmate Smith the closest room available on the housing template (3SW605) to the physical count (3SW604)." At his deposition in January 2007, Gill could not recall these details with certainty. Gill could not recall whether he had assigned Smith to 605 and intended for him to go to 604 or vice versa, and Gill could not recall "how [Smith] came to be in cell 604." Gill stated that he was

6

aware that Smith had entered 604 but did not know whether Smith was placed there. Gill did not know that Jenkins was in pod 600 when he assigned Smith to that area.

Townsend told investigators from the jail and testified in his deposition that, when he and Smith arrived at pod 600, Culver directed him to place Smith in cell 604 instead of cell 605. Townsend also testified that he did not know why Smith was not placed in cell 605 and that he did not have any conversations with Culver about Smith's cell assignment. Townsend has provided inconsistent testimony about whether Culver's instruction was contrary to Smith's armband. On some occasions, Townsend recalled Smith's armband as reflecting an assignment to cell 605; at other times, Townsend could not recall or would not specify the assignment on the armband. Townsend testified that he knew "that [Smith] didn't go in the cell that was in there that he was supposed to go into." Townsend has also provided inconsistent testimony about why Smith could not go into cell 605; although he testified in his deposition that cell 605 was full, he was equivocal in his statement to the investigators.

Culver told investigators from the jail and testified in his deposition that when Townsend and Smith arrived at pod 600, Townsend declared that Smith was assigned to cell 604, and that he had confirmed Townsend's statement by asking

7

Smith what the armband said. These statements are inconsistent with Townsend's testimony. Like Townsend, Culver also offered inconsistent testimony about why Smith could not go into cell 605. Culver told investigators from the jail that cell 605 was full, but he declined to substantiate that statement in his deposition. The initial statements of Townsend and Culver that cell 605 was full conflict with the statements of Gill that Smith was assigned to cell 605 because the computer database showed a space available there.

In any event, jail records state that seven minutes after Smith arrived at cell 604, he left for a court appearance. Smith returned from court nearly four hours later and was again placed in Jenkins's cell. Gill, Townsend and Culver were not on duty when Smith returned to Jenkins's cell.

After lockdown and lights-out at 11:00 that evening, Smith and Jenkins engaged in a loud physical altercation. Inmate Robert Weekley, who was in cell 606, "repeatedly pressed the 'call button' in [his] cell to signal the [d]etention [o]fficers on duty in the 'tower' and alert corrections employees about the altercation." Weekley declared that the altercation lasted twenty to twenty-five minutes and involved "pounding on the walls, yelling and screaming, and commotion." Weekley also declared that "[n]o one responded to [his] call and it

8

was not until breakfast time on the morning of July 7, 2004, at approximately 4:40 a.m., that [he] observed any [d]etention [o]fficers enter pod 600."

Shortly after 4:00 a.m. on July 7, officer Dameco Moses inspected pod 600. Moses approached cell 604 and observed Smith sitting on the desk and Jenkins lying on the floor. Moses tapped Jenkins's foot with his foot and received no reaction. He removed Smith from the cell and requested assistance from his colleagues, who determined that Jenkins was dead. Detective L.A. Ruffin of the DeKalb County Department of Public Safety inspected the crime scene and reported that Jenkins's body was in full rigor and that his death was the result of "stomping." The autopsy report of the medical examiner states that the cause of death was "[g]eneralized blunt trauma."

In July 2006, Jenkins's children sued the county, Sheriff Brown, in his individual and official capacities, and the detention officers in their individual capacities. Jenkins's children asserted a claim for Jenkins's wrongful death under Georgia law, Ga. Code Ann. § 51-4-5, and a claim for violation of Jenkins's rights under the Eighth and Fourteenth Amendments to the Constitution, 42 U.S.C. § 1983. Jenkins's children alleged that the Sheriff failed to supervise and train the officers, the officers were deliberately indifferent to a significant risk of serious harm to Jenkins when they placed Smith in his cell, and that indifference caused

9

Jenkins's death. Jenkins's children later dismissed their claims under state law and their claims under federal law against the county and Sheriff Brown in his official capacity.

In April 2007, the Sheriff and officers moved for summary judgment on the basis of qualified immunity. The district court concluded that the Sheriff and officers had committed no constitutional violation and granted summary judgment in their favor.

## II. STANDARD OF REVIEW

We review <u>de novo</u> a summary judgment. We view the facts and make "all reasonable inferences" in favor of Jenkins's children. <u>See</u> <u>Whatley v. CNA Ins. Cos.</u>, 189 F.3d 1310, 1313 (11th Cir. 1999) (per curiam). We affirm the judgment if we conclude that there is no genuine issue of material fact, <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970), which is present if "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).

## III. DISCUSSION

Jenkins's children argue that, when the officers placed Smith in their father's cell, the officers were deliberately indifferent to a substantial risk of

serious harm to their father and violated their father's constitutional rights. "It is well settled that '[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.'" Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995) (quoting Farmer v. Brennan, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974 (1994) (internal quotation & citations omitted)). Although Jenkins's rights as a pretrial detainee are governed by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which applies to prisoners, "the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." Marsh v. Butler County, Ala., 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (en banc). "To show a violation of [the plaintiff's] Eighth Amendment rights, Plaintiff must 'produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" Purcell ex rel. Estate of Morgan v. Toombs County, Ga., 400 F.3d 1313, 1319 (11th Cir. 2005) (quoting Hale, 50 F.3d at 1582).

Proof of deliberate indifference requires more than does proof of negligence. To be deliberately indifferent, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct.

11

at 1979. Although negligence can produce tragic results, it is not actionable as a violation of the Eighth Amendment: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id. at 838, 114 S. Ct. at 1979.

The officers respond that they are entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lassiter v. Ala. A & M Univ., Bd. of Tr., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)); Siegert v. Gilley, 500 U.S. 226, 231–33, 111 S. Ct. 1789, 1793 (1991)). When an official is eligible for qualified immunity because he performed a discretionary function, the burden shifts to the plaintiff.

"To defeat a qualified immunity defense, [a] plaintiff bears the burden of showing that 'the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or . . . the law clearly proscribed the actions the defendant . . . took.'" Barts v. Joyner, 865 F.2d 1187, 1190 (11th

12

Cir. 1989) (quoting Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816 (1985)).  To determine whether a plaintiff has satisfied this burden, a court must apply the two-part test established in Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  The first part requires the court to determine whether the plaintiff's complaint, if true, establishes a constitutional violation, and the second part requires the court to determine whether the right violated was clearly established.  Id.

The district court concluded that Jenkins's children failed to present evidence of a constitutional violation.  The district court found that, although it was easy to say in hindsight that there was a substantial risk that Smith would seriously harm Jenkins, Jenkins's children failed to prove that the officers were deliberately indifferent to that risk.  The district court stated that, at most, the evidence proved that the officers were negligent.

On appeal, Jenkins's children raise four arguments about the deliberate indifference of the officers.  They argue, first, that the officers were subjectively aware of a substantial risk of serious harm to Jenkins; second, the officers deliberately placed Smith in Jenkins's cell as retaliation for Jenkins's use of racial slurs; and third, the officers were aware of the risk to Jenkins because it was obvious.  Jenkins's children argue that the inconsistencies of the officers'

13

testimonies are evidence of their deliberate indifference. Jenkins's children also argue, fourth, that the officers' deliberate indifference caused their father's death.

We conclude that, even if the officers were deliberately indifferent, Jenkins's children have not proved that the officers' indifference caused Jenkins's death. Causation demands "proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993) (quoting Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982)). An official's acts or omissions must be "the cause[,] not merely a contributing factor" of the constitutional violation. Id.

Jenkins's children have not proved that the officers caused Smith to be in Jenkins's cell when Smith murdered Jenkins. Smith left cell 604 minutes after Townsend and Culver escorted him there and returned hours later, after all of the officers were off duty. The July 6, 2004, logbook for 3 Southwest contains three entries about Smith. The first entry was made at 3:06 p.m. and states that Smith arrived on the floor. The second entry was made at 3:13 p.m. and states that Smith left the floor to go to court. The final entry was made at 7:52 p.m. and states that Smith returned from court. Culver, Townsend, and Gill were off duty by 7:52 p.m. The logbook contains an entry made at 4:22 p.m. that states that Culver was

14

relieved by the evening watch, and Townsend and Gill testified that their shifts had ended and they had left the jail before Smith returned from court.

The record is silent about why Smith was returned to Jenkins's cell. The record states that Officers McKenzie and Reece were on duty when Smith returned to that cell, but Jenkins's children failed to present any evidence that the officers who initially placed Smith there, hours earlier, played any role whatsoever in that later placement. Because Jenkins's children have not presented evidence that Smith's initial placement in Jenkins's cell caused Jenkins's death, Jenkins's children have failed to prove an element of their claim of deliberate indifference.

## IV. CONCLUSION

The summary judgment in favor of Culver, Gill and Townsend is **AFFIRMED.**