[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-11250
_____

D.C. Docket No. 1:10-cv-02590-SCJ

NADINE KEITH,
as Administrator for the Estate of Godfrey Cook,
GARY MADDOX,
WILLETTA GRAY,

Plaintiffs -Appellees,

versus

DEKALB COUNTY, GEORGIA,
et al.,

Defendants,

THOMAS BROWN,
individually as DeKalb County Sheriff,

Defendant -Appellant.
_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(April 23, 2014)

Before TJOFLAT, WILSON, and RIPPLE,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

On January 7, 2009, Godfrey Cook, a pretrial detainee, was murdered in the DeKalb County Jail, in Decatur, Georgia, by another pretrial detainee, Saleevan Adan.  Eighteen months later, Nadine Keith, the administrator of Cook's estate, and Cook's two adult children brought this action for money damages under both federal and state statutory law against DeKalb County, the DeKalb County District Attorney's office, the former District Attorney and two of her employees, the DeKalb County Sheriff, and several correctional officers at the Jail.[1]  Keith sought relief against the Sheriff, the former District Attorney and her employees, and the correctional officers under a federal Civil Rights Act, 42 U.S.C. § 1983,[2] on the

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1] Keith's complaint invoked the District Court's subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.  The Sheriff and the correctional officers were sued in both their official and individual capacities.

[2] Section 1983 was enacted on April 20, 1871, as part of the Civil Rights Act of 1871. The section provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

2

theory that Cook's death resulted from the defendants' maintenance of the Jail and his safety in derogation of his Fourteenth Amendment rights, and under the Georgia Wrongful Death Act, O.C.G.A. § 51-4-5, based on the defendants' negligence in failing to protect Cook from inmate violence.

The federal claims against all of the defendants except the Sheriff have been dismissed.[3]  This appeal is from the District Court's denial of the Sheriff's motion for summary judgment on Keith's § 1983 claim based on the doctrine of qualified immunity.[4]  We reverse.

## I.

The DeKalb County Jail houses over 3,000 inmates.  The overwhelming majority are pretrial detainees; the rest are convicted defendants serving a short sentence or awaiting transfer to a state penitentiary.[5]  The Jail is divided into

---

[3] The District Court dismissed the federal claims against the defendants in their official capacities based on Eleventh Amendment immunity.  Keith stipulated to DeKalb County being dismissed, and the District Court accepted the stipulation and dismissed the County.  The District Court dismissed the all of the claims against the former District Attorney and her employees in their individual capacity under Fed. R. Civ. P. 12(b)(6), for failure to state a basis for relief, and the federal claims against the correctional officers in their individual capacities based on the defense of qualified immunity.  All that remains in this case are the claims against the Sheriff in his individual capacity, and the state-law claims against the Sheriff and the four correctional officers.

[4] This is an interlocutory appeal.  We have jurisdiction under 28 U.S.C. § 1291 (2012). See Mitchell v. Forsyth, 472 U.S. 511, 529–30, 105 S. Ct. 2806, 2817, 86 L. Ed. 2d 411 (1985) (providing that under the collateral order doctrine, the courts of appeals have jurisdiction under 28 U.S.C. § 1291 to review the denial of qualified immunity).

[5] For ease of discussion, we refer to the Jail's inmates as inmates or pretrial detainees.

3

quadrants: Southeast ("SE"), Southwest ("SW"), Northeast ("NE"), and Northwest ("NW"). Each quadrant is divided into eight floors,[6] and each floor is divided into six pods designated 100, 200, 300, 400, 500, and 600. A pod contains two levels of eight cells, for a total of sixteen cells. A floor, then, contains ninety-six cells. Depending on the pod, a cell has either one or two beds; so a pod houses somewhere between sixteen and thirty-two inmates.

The DeKalb County Jail is an indirect-observation jail, which means that the detention officers[7] observe the inmates from a central tower, rather than from inside each housing area. A detention officer is on duty in the central tower at all times to open the doors to a pod and to allow officers and staff to enter pods for walk-throughs and inspections. Every cell is equipped with a call button, which an inmate can activate to alert the officer in the central tower of any concern.

When an individual is taken to the Jail for confinement, the individual is placed in a holding cell pending classification. Classification is a two-step

---

[6] None of the parties presented the District Court with a layout of the Jail. The configuration we describe in the text is a compilation of bits of testimony given by Jail personnel on deposition or via affidavit. We base our statement that each of the quadrants contains eight floors from testimony indicating that the quadrants contain "at least" eight floors.

[7] The parties sometimes refer to the detention officers as correctional officers.

process.[8]  First, a classification officer feeds the individual's criminal history into a computer, and the computer generates a score indicating the level of security—i.e., maximum, medium, or minimum—needed to house the person.  Next, an intake nurse assesses the individual's medical and mental health risk; the classification officer takes that assessment into account in determining where the individual will be housed.  Once classified, the individual is given an armband bearing his or her name, sex, assigned quadrant, and the numbers of the floor, pod, and cell where he or she is housed.  If it becomes necessary to reclassify the individual, another armband is issued.

The DeKalb County Sheriff's Office contracts out the provision of medical and mental health services at the Jail.  In 2008, Correct Health had the contract for both services, although by subcontract it arranged for MHM Correctional Services Incorporated ("MHM") to provide the mental health services.[9]  MHM provided those services through a staff of approximately thirty people, consisting of licensed practical nurses, registered nurses, mental health clinicians, and several

---

[8] We describe the classification process the witnesses described, in the present tense, and assume that they described the classification process in place prior to Cook's death on January 7, 2009.

[9] From August 2006 until December 2010, Correct Health provided the medical services, and MHM provided the mental health services.

5

psychiatrists.[10]  Dr. William Brickhouse, who had a Ph.D in clinical psychology, headed the staff as the director of mental health.

Inmates with mental health problems were housed in three locations at the Jail, 3SW, 7NE, and 3A.[11]  3SW is the third floor of the Southwest quadrant. Mental health inmates were housed there in pods 100, 200, 400, and 600.[12]  The cells in pods 100 and 200 were single-bed cells; the cells in pods 400 and 600 were two-bed cells.  MHM staff treated pods 100, 400, and 600 as "synonymous,"[13] in that the inmates housed in those pods did not present a risk of harm to themselves or other inmates.  Inmates in pod 100 were let out of their cells one at a time—for exercise and other needs—and were kept isolated.  Those in pods 400 and 600 were let out in groups and were permitted to interact.  According to Dr. Brickhouse, inmates were assigned to pod 200 if they refused to take their medication or were placed on a precautionary suicide watch.[14]

---

[10] The time these psychiatrists spent at the Jail added up to the time 2.15 full-time psychiatrists would provide.

[11] The record does not indicate whether 3A was located in one of the quadrants.  Dr. Brickhouse characterized it as "an infirmary/stabilization unit," implying that 3A was not located in one of the cell blocks, i.e., one of the quadrants.

[12] Pods 300 and 500 were for inmates who required medical (as opposed to mental health) attention.

[13] Record, no.107, at 119 (deposition of Dr. Brickhouse).

[14] Precautionary suicide watch means that the inmate has threatened to commit suicide but has not taken active steps to complete the act.

7NE is the seventh floor of the Northeast quadrant.  It was used to "lockdown" inmates with a variety of behavioral problems.[15]  Inmates who had taken overt steps to commit suicide were assigned to 3A and placed under acute suicide watch.[16]  Also assigned to 3A were inmates who presented an acute psychiatric disorder and required special custody.  MHM staffed 3A round the clock with mental health nurses, and a psychiatrist was either on-site or on-call all hours of the day.

MHM alone decided whether an inmate should be housed in 3SW, 7NE, or 3A.  If MHM decided that the inmate should be housed in 3SW or 7NE, it informed classification of the appropriate pod in which to house the inmate, and a classification officer designated the cell in which the inmate would be placed.  Detention officers had the authority to move the inmate from the designated cell to another cell in the same pod.  Classification would be promptly notified if an inmate were moved.[17]

---

[15] Information that an inmate had been assigned to a cell in 7NE did not necessarily lead to an entry in the inmate database that the inmate was a behavioral problem.

[16] 3A had 27 cells, 18 for male inmates and 9 for females.

[17] According to Dr. Brickhouse, from a mental health perspective, moving an inmate to another cell within the same pod was not a cause for concern.  Detention officers could not move an inmate to another pod (within 3SW or 7NE), however, without MHM's permission.

7

II.

The District Court record provides only a partial picture of Saleevan Adan's criminal history and interactions with the DeKalb County judicial system prior to the day he killed Godfrey Cook. However, from the DeKalb County Superior Court Online Judicial System,[18] which contains a recording of the Docket Sheet for the case the State brought against Adan for murder in January 2001, and Adan's Inmate Record and the Jail's Incident Reports, which were before the District Court when it ruled on the Sheriff's motion for summary judgment, a more-complete picture appears with respect to Adan's incarceration at the Jail—intermittently from January 31, 2001, to February 29, 2008, and continuously from February 29, 2008, to January 7, 2009, when Cook's murder occurred.

A.

On January 31, 2001, Adan was arrested for murder, and the DeKalb County Superior Court ordered that he be detained in the DeKalb County Jail. Adan was subsequently indicted, and at his arraignment on January 31, 2002, the Superior Court ordered that he be psychologically evaluated. On April 2, 2002, the court found Adan incompetent to stand trial, and turned him over to the Georgia

---

[18] We take judicial notice of the Online Judicial System. See Fed. R. Evid. 201.

8

Department of Human Resources, which sent him to Georgia Regional Hospital in Augusta for treatment and observation.

The Superior Court held competency hearings in Adan's case in October 2003 and in June 2004.[19] Prior to each hearing, Adan was brought to the DeKalb County Jail, to be held there pending the court's decision. The court found him not competent on both occasions,[20] and, at the Department's direction, he was taken to Central State Hospital in Milledgeville.[21] Adan's mental health did not improve, so, on November 1, 2006, the Superior Court entered an order administratively closing the case.[22] We infer—because the parties do not tell us, and the public records are silent on this point—that Adan remained at Central State Hospital for all of 2007 and the first two months of 2008.

---

[19] The parties did not present evidence on this point, but an entry on the Docket Sheet indicates that the Superior Court ordered the DeKalb County Sheriff to transport Adan to DeKalb County from Central State Hospital.

[20] We take judicial notice of the fact that under Georgia law the Department of Human Resources was to report periodically to the Superior Court on Adan's condition—whether there was a substantial probability that he would attain competency in the foreseeable future. O.C.G.A. § 17-7-130(b) (2000).

[21] Georgia law provided that a defendant found incompetent to stand trial could be civilly committed or discharged into the custody of law enforcement. Id. § 17-7-130(c), (e). The Superior Court Docket Sheet does not indicate whether Adan was civilly committed following the competency hearing on April 2, 2002. Following the June 2004, hearing, however, the court ordered Adan civilly committed to the custody of the Department of Human Resources pursuant to Chapter 3 of Title 37 of the Georgia Code.

[22] This order was made by a different judge, who had been elected in 2004 and replaced the original judge for the remainder of Adan's case. The Superior Court Docket Sheet has an entry, dated November 28, 2006, stating that Adan was declared incompetent to stand trial.

B.

On February 20, 2008, a forensic psychologist at the Department of Human Resources concluded that Adan had become competent to stand trial. The Superior Court therefore ordered Adan returned to Decatur, and on February 29, he was again booked into the DeKalb County Jail. He was assigned to a bed in 3A. On March 3, the Superior Court entered an order directing the DeKalb County Sheriff to hold Adan until further order of the court. Adan's Inmate Record has an entry dated March 3, indicating that he was to be pharmaceutically medicated. The Inmate Record reveals that after his assignment to 3A on February 29, he was moved about the Jail—to and from 3SW and 3A or 7NE—as follows.[23]

On March 5, Adan was moved from 3A to 3SW pod 600. On March 17, he was moved from 3SW pod 600 to 3SW pod 100. On March 18, he was moved from 3SW pod 100 to 3A. On March 21, he was moved from 3A to 3SW pod 100. Ten days later, Adan was returned to 3A for observation.[24]

---

[23] The record before the District Court, which includes the Jail's Classification Movement Sheet records and Adan's Inmate Record, indicates that MHM recommended all of the relocations described in the text—say from 3A to 3SW or from 3SW to and from 7NE. The Classification Movement Sheet indicates the number of the cell Adan occupied if he was moved to a pod in 3SW.

[24] The Docket Sheet indicates that on April 22, 2008, the Superior Court held a non-jury hearing in a civil matter and on May 5 held a pretrial hearing in Adan's murder case. The Docket Sheet is silent as to the substance of these hearings.

10

On May 25, Adan was transferred from 3A to 3SW pod 100.  Three days later, on May 28, he was moved from 3SW pod 100 to 7NE because of a behavior problem.  On June 26, he was returned to 3SW pod 100.  The next day, he was transferred from 3SW to 7NE.  On July 24, he was moved from 7NE to 3SW pod 100.

On August 28, the Superior Court ordered that Adan be psychologically evaluated.  The next day, August 29, he was involved in a physical altercation with two other inmates, apparently over one of the other inmates defecating and urinating in a dayroom sink in pod 100.

On September 9, the Superior Court held a pretrial hearing.  Although the Docket Sheet is silent as to what transpired at that hearing, we infer that it concerned Adan's competency to stand trial.  On October 24, a psychologist with the Georgia Department of Human Resources at Georgia Regional Hospital determined that Adan was not competent to stand trial.

On November 2, Adan was moved to 3A and placed on suicide watch.  The suicide watch was discontinued the next day, though he remained in 3A.  On November 6, Adan was transferred from 3A to 3SW pod 400.  Four days later, he was relocated to 3SW pod 200 and placed on precautionary suicide watch.  On November 12, he was transferred from 3SW pod 200 to 3SW pod 600.  On November 27, he was transferred from there to 3A and placed on suicide watch.

11

On December 1, he was moved back to 3SW pod 600, and on December 2 from pod 600 to 3SW pod 200.

On December 12, 2008 the Superior Court entered an order finding Adan incompetent to stand trial. The court determined "by clear and convincing evidence that [Adan] . . . remains mentally ill and a danger to others," and ordered that he be civilly committed to receive involuntary inpatient treatment.[25] This order was not transmitted to the DeKalb County Sheriff's Office or to MHM until after Adan killed Cook.

C.

On January 6, two detention officers, Corporal Edward Mayo and Officer Royzell Lampkin, moved Adan from 3SW pod 200 to 3SW pod 600, where he was assigned to cell 610.[26] Before they arrived at cell 610, Adan asked to use the telephone. The officers denied his request because the Jail was going into "lockdown."[27] Adan responded to this denial by refusing to enter cell 610; he entered cell 613 instead. Godfrey Cook, who had been booked on December 5, 2008, on charges of possession of cocaine, and had been assigned to one of the two

---

[25] Order Finding the Defendant Incompetent To Stand Trial and Order of Civil Commitment, Georgia v. Adan, No. 01-CR-5128, at 1 (Ga. Super. Ct. Dec. 11, 2008).

[26] See supra note 23.

[27] The record does not indicate the reason for the lockdown, but it appears that this particular lockdown was a regularly scheduled occurrence at 2:00 pm.

beds in cell 613, was in the cell when Adan entered it.  At this point, Corporal Mayo went to the central tower, joining Corporal Jermaine Cooper, who was on duty, and Officer Lampkin conducted a walk-through inspection of 3SW[28] and then left the floor.[29]

At approximately 2:50 p.m., within thirty minutes after he entered cell 613, Adan broke the sprinkler, setting off an alarm and flooding pod 600.  Thomas Gowdy, who was off-duty at the time,[30] went to the central tower and remained there to allow Corporals Mayo and Cooper and Officer Lampkin, who had returned to the floor, to respond to the alarm and enter the pod.  Corporal Mayo and Officer Lampkin went to cell 613.  They found Cook face-down on floor and Adan standing in the back of the cell.  They removed Adan from the cell and called for assistance.  Cook was transported to Grady Hospital in Atlanta, where he was pronounced dead.

---

[28] That day, January 6, Corporal Mayo was training Officer Lampkin in 3SW security procedures.

[29] Neither Mayo nor Lampkin informed MHM staff or the classification officer on duty that Adan had refused to enter 610 or that he had entered Cook's cell.

[30] Shortly before the sprinkler alarm went off, Corporal Gowdy had gone to the central tower looking to Corporal Mayo, who was about to go off-duty, to give him a ride home.

13

D.

After Cook's death, an investigator in the Office of Professional Standards, a unit of the DeKalb County Sheriff's Office, conducted an investigation and issued a report. The report concluded that Corporal Mayo and Officer Lampkin, in not notifying MHM and the classification officer on duty that Adan had entered cell 613, violated Jail policy.[31] The report noted that inmates in 3SW were routinely relocated to cells other than the ones to which they were assigned, although some detention officers disputed that the practice was routine. In addition, the report included the statement of an inmate who was in the cell next to 613 when the killing occurred. He said that he hit his in-cell call button, but Corporal Mayo, whom he could see in the central tower, disengaged the call-button indicator light.[32] The investigator filed one charge of neglect of duty against Corporal Mayo for placing Adan in cell 613 without notifying a supervisor, two charges of neglect of duty for improperly training Officer Lampkin on reclassification procedures in 3SW, and one charge of neglect of duty against Officer Lampkin for failing to follow written policy requiring inmates be reclassified if they move to another cell.

---

[31] The report also stated that Officer Lampkin violated Jail policy by failing to check Adan's armband before allowing him to enter cell 613.

[32] The inmate said that Mayo was talking on his cell phone at the time.

14

III.

On August 18, 2010, Nadine Keith, as administrator for the estate of Godfrey Cook, and Cook's adult children, Gary Maddox and Willetta Gray, brought this action for damages. Her four-count amended complaint, filed on April 20, 2012, is the charging pleading before us in this appeal. It names as defendants DeKalb County, DeKalb County Sheriff Thomas E. Brown, and four officers at the Jail: Corporals Mayo, Cooper, and Gowdy, and Officer Lampkin.[33] All were sued in their official as well as individual capacities.[34]

Count One of the amended complaint is brought against the Sheriff and the four officers pursuant to 42 U.S.C. § 1983 and alleges that they were deliberately indifferent to a substantial risk of harm to Cook, thus violating his Eighth and Fourteenth Amendment rights.[35] Summarized, the Count One allegations are: (1)

_____

[33] On March 30, 2012, the Sheriff, Mayo, Gowdy, and Lampkin filed a motion for summary judgment. Cooper did not join in the motion because Keith had not perfected service of process on Cooper. Keith filed the amended complaint on April 20, 2012, with the consent of these defendants.

[34] In her initial complaint, Keith sued (in addition to DeKalb County, the Sheriff and the four Jail officers) the DeKalb County District Attorney's Office, the former District Attorney, Gwen Fleming, and two of her office's employees, Robert Statham and Zita Chatman. On October 20, 2010, the District Court granted the motions to dismiss filed by the District Attorney's Office, Fleming, Stratham, and Chatman pursuant to Fed. R. Civ. P. 12(b)(6).

We note that neither the initial complaint nor the amended complaint named as defendants MHM or any member of its staff at the Jail.

[35] Because Cook was a pretrial detainee who had not been convicted of the crime with which he was charged, the Eighth Amendment does not apply. See Tittle v. Jefferson Cnty.

15

Sheriff Brown failed to adequately supervise pretrial detainees housed in the Jail;

(2) Sheriff Brown failed to follow Jail policies regarding the relocation of inmates

and thus created an increased likelihood of violence; (3) Sheriff Brown failed to

properly train and supervise the detention officers working in the 3SW pods

housing inmates with  mental health problems; (4) the Sheriff and the four officers

failed to properly train the detention officers; (5) they allowed inmates to be placed

in two-bed cells, which increased the likelihood of inmate-on-inmate violence; and

---

Comm'n, 10 F.3d 1535, 1546 (11th Cir. 1994) (en banc) ("It is well settled that the Eighth Amendment prohibitions against cruel and unusual punishment do not apply to pretrial detainees." (citing Ingraham v. Wright, 430 U.S. 651, 671 n.40, 97 S. Ct. 1401, 1412 n.40, 51 L. Ed. 2d 711 (1977)).  Instead, Keith's claim is properly analyzed under the Substantive Due Process Clause of the Fourteenth Amendment.  See Cagle v. Sutherland, 334 F.3d 980, 985 (11th Cir. 2003) (per curiam) ("Because [the plaintiff] was a pretrial detainee, his section 1983 claims are based on the due process clause of the Fourteenth Amendment."); Lolli v. Cnty. of Orange, 351 F.3d 410, 418–19 (9th Cir. 2003) (noting that deliberate indifference claims, "when brought by a detainee . . . , are analyzed under the substantive due process clause of the Fourteenth Amendment."); cf. Ray v. Foltz, 370 F.3d 1079, 1082 (11th Cir. 2004) (explaining that "foster children have a liberty interest, pursuant to the substantive due process clause of the fourteenth amendment," in being free from a foster home's deliberate indifference to a substantial risk of serious harm).

However, "the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983).  Thus, "the standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments," Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (en banc), and "it makes no difference whether [Cook] was a pretrial detainee or a convicted prisoner because 'the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees.'" Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) (quoting Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir.1996)).

16

(6) they engaged in unspecified conduct that created a substantial risk of serious harm to Cook.  Record, no. 94, at 21–24.

Count Two incorporates the previous 177 paragraphs of the amended complaint, including Count One, and seeks judgment against the Sheriff under O.C.G.A. § 15-16-24[36] for the "misconduct of guards, sheriff's deputies, and jailers under his supervision," and for "fail[ing] to exercise ordinary care and diligence to prevent the conditions and acts . . . which proximately cause the injuries to Plaintiff's decedent."  Record, no. 94, at 25.[37]  Count Three incorporates the previous 182 paragraphs of the amended complaint, including Counts One and Two, and seeks damages against all defendants under the Georgia Wrongful Death

---

[36] Section 15-16-24 of the Georgia Code states, in pertinent part:

Sheriffs are liable for the misconduct of their jailers . . . and persons injured by a jailer have the . . . option in bringing an action on the jailer's bond . . . , provided that the sheriff shall not be liable for such misconduct and no claim or cause of action against the sheriff for such misconduct shall exist unless one of the following conditions exists:

(1) The sheriff personally benefited financially from the act complained of;

(2) The sheriff was personally aware of and had actual knowledge of the act complained of and had actual knowledge that the act was illegal, was contrary to law, or was the breach of a duty imposed by law and either acted to cause or failed to prevent the act complained of; or

(3) The sheriff failed to exercise ordinary care and diligence to prevent the condition or act which proximately caused the injury complained of.

[37] In incorporating the allegations of Count One, Count Two, in addition to seeking relief against the Sheriff under O.C.G.A. § 15-16-24, actually sought § 51-4-5 relief against the four officers as well as the Sheriff.

17

Act, O.C.G.A. § 51-4-5,[38] "by reason of the facts stated above and conduct of Defendants."  Record, no. 94, at 26.  Court Four incorporates the previous 186 paragraphs of the complaint, including Counts One through Three, and seeks punitive damages against all defendants for the conduct alleged in those counts and the "callous disregard by Defendants for Plaintiff's decedent's federally protected rights, secured under the Eighth and Fourteenth Amendments."  Record, no. 94, at 26–27.[39]

---

[38] The Wrongful Death Act states:

(a) When there is no person entitled to bring an action for the wrongful death of a decedent under Code Section 51-4-2 or 51-4-4, the administrator or executor of the decedent may bring an action for and may recover and hold the amount recovered for the benefit of the next of kin. In any such case the amount of the recovery shall be the full value of the life of the decedent.

(b) When death of a human being results from a crime or from criminal or other negligence, the personal representative of the deceased person shall be entitled to recover for the funeral, medical, and other necessary expenses resulting from the injury and death of the deceased person.

O.C.G.A. § 51-4-5.

[39] The complaint, through its incorporation into successive counts all preceding allegations and counts, is a quintessential "shotgun" pleading—the sort of pleading we have been roundly condemning for 30 years.  See, e.g., Davis v. Coca-Cola Bottling Co., 516 F.3d 955, 979 (11th Cir. 2008) ("[T]his court has been roundly, repeatedly, and consistently condemning [shotgun pleadings] for years, long before this lawsuit was filed."); Pelletier v. Zweifel, 921 F.2d 1465 (11th Cir. 1991); Fullman v. Graddick, 739 F.2d 553 (11th Cir. 1984).  By the time a reader of the pleading gets to the final count, it is exceedingly difficult, if not impossible, to know which allegations pertain to that count (according to its label), to separate the wheat from the chaff.  Put plainly, shotgun pleadings unnecessarily tax the time and resources of the District Court as well as the Court of Appeals.

18

The defendants answered Keith's original complaint, but not the amended complaint. Instead of using the amended complaint and answers to shape the issues to be litigated, the parties used their submissions to the District Court in support of and in opposition to the motion for summary judgment filed by the Sheriff, Mayo, Gowdy, and Lampkin on March 30, 2012, as the vehicles for presenting their claims and defenses.[40]

On February 21, 2013, the District Court ruled on the motion for summary judgment the Sheriff, Mayo, Gowdy, and Lampkin had filed on March 30, 2012. The court also dismissed from the case on the parties' stipulation the claims against DeKalb County and the claims brought against the Sheriff, Mayo, Gowdy, and Lampkin in their official capacities.

In addressing the motion for summary judgment, the court focused its analysis on whether the movants were entitled to prevail on Count One based on the defense of qualified immunity, Counts Two and Three based on the defense of official immunity, and Count Four on the ground that the record did not support an

---

[40] The parties' submissions were based on the discovery in the case, which began on November 20, 2010, and was scheduled to last nine months. The District Court extended discovery, however, and it closed March 1, 2011. After discovery was completed, on March 30, 2012, the defendants moved for summary judgment on all counts.

19

award of punitive damages on Counts One, Two, or Three.[41]  The court held that

Mayo, Gowdy, and Lampkin, but not the Sheriff, were entitled to summary

judgment on the Count One claims because Keith failed to show that they were

subjectively aware of a substantial risk of serious harm to inmates in 3SW and that

they recklessly disregarded a substantial risk of serious harm to Cook.[42]  The court

denied the Sheriff summary judgment on Count One and denied all defendants

summary judgment on Counts Two and Three, finding that issues of fact on the

official immunity defense precluded summary judgment.  As for Count Four, the

court denied the Sheriff summary judgment on the claims for punitive damages on

Counts One, Two, and Three, and denied Mayo, Gowdy, and Lampkin summary

judgment on the claims for punitive damages on Counts Two and Three.[43]

Sheriff Brown now appeals, challenging the District Court's decision

rejecting his defense of qualified immunity with respect to Count One's claim for

damages under § 1983.

---

[41] The District Court's February 21, 2013 order, as it relates to the claims of Counts One through Four, does not refer to Counts One, Two, Three, or Four.  Rather than refer to any of the counts of the amended complaint, the order simply deals with the facts and legal authorities set out in the parties' submissions on the motion for summary judgment.

[42] The Court therefore gave Mayo, Gowdy, and Lampkin summary judgment on the Count Four claim for punitive damages with respect to the Count One claims against them.

[43] On April 17, 2013, the District Court dismissed without prejudice all claims against Cooper because Keith had failed to serve him with process.  See supra note 33.

IV.

"[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817, 86 L. Ed. 2d 411 (1985). When reviewing a district court's denial of summary judgment, we exercise de novo review. Fils v. City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011). Summary judgment is appropriate where the moving party—here Sheriff Brown—"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the material facts, we draw all inferences in favor of the nonmoving party—here Keith. Fils, 647 F.3d at 1287.

A.

The first two of Keith's claims against Sheriff Brown—that he failed to supervise detainees and that the Jail's policies regarding the movement of inmates created a substantial risk of harm to Cook—implicate the same rule: "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the [Fourteenth] Amendment." Marsh v. Butler Cnty., Ala., 268

F.3d 1014, 1028 (11th Cir. 2001) (en banc).[44]  Whether a risk of harm is substantial

is an objective inquiry.  See id. at 1028–29.  "Deliberate indifference requires the

following: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that

risk; (3) by conduct that is more than gross negligence.'"  Franklin v. Curry, 738

F.3d 1246, 1250 (11th Cir. 2013) (quoting Goodman v. Kimbrough, 718 F.3d

1325, 1331–32 (11th Cir.2013)).  "[O]nce it is established that the official is aware

of this substantial risk, the official must react to this risk in an objectively

unreasonable manner."  Marsh, 268 F.3d at 1029.

However, "[i]t is well established in this Circuit that supervisory officials are

not liable under § 1983 for the unconstitutional acts of their subordinates on the

basis of respondeat superior or vicarious liability."  Cottone v. Jenne, 326 F.3d

---

[44] Marsh involved a convicted prisoner and a pretrial detainee who sought relief for an alleged deprivation of their rights protected by the Eighth and Fourteenth Amendments.  As the en banc court recognized and as is stated in note 35, supra, pretrial detainees are protected by Fourteenth Amendment's Due Process Clause, not the Eighth Amendment.  In Marsh, after noting that the substantive legal standard for a pretrial detainee challenging the conditions of his confinement under the Fourteenth Amendment is nearly identical to the standard applied to a convicted prisoner's challenge under the Eighth Amendment, the court applied the same standard to both plaintiffs and "refer[red] to the Amendments interchangeably, most often referring to the Eighth."  Marsh, 268 F.3d at 1024 n.5.

It appears, however, that the our decision in Marsh to use the Eighth and Fourteenth Amendments interchangeably has spurred further confusion, as pretrial detainees continue to challenge the conditions of their confinement under the incorrect amendment.  We therefore refer only to the Fourteenth Amendment in analyzing Keith's claims.  The statement quoted above includes the alteration it does—replacing Eighth with Fourteenth—in hopes that future pretrial detainees will rely on the correct amendment when challenging the conditions of their confinement.

22

1352, 1360 (11th Cir. 2003) (internal quotation marks omitted).  Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation.  Id.

> The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

Id. (internal quotation marks omitted) (citations omitted).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation mark omitted).  In short, "the standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  Cottone, 326 F.3d at 1360 (alteration in original) (internal quotation marks omitted).

It is not enough, however, for Keith to demonstrate that a genuine issue of fact exists on the merits of her claim.  She must also overcome Sheriff Brown's assertion of qualified immunity by proving (1) that Sheriff Brown violated Keith's

23

federal constitutional right, and (2) that the constitutional right was "clearly established" at the time Sheriff Brown acted.  Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 815–16, 172 L. Ed. 2d 565 (2009).[45]  The qualified immunity inquiry can begin with either step, neither is antecedent to the other.  Id. at 236, 129 S. Ct. at 818.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [state official] that his conduct was unlawful in the situation he confronted."  Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012) (alteration in original) (internal quotation marks omitted).

Turning to the matter at hand, in order to prove that Sheriff Brown violated Cook's constitutional rights, Keith must show that the Sheriff Brown had subjective knowledge of a risk of serious harm to Cook and that he recklessly disregarded that risk.  See Goodman, 718 F.3d at 1331–32.  Keith does not allege that Sheriff Brown personally participated in the alleged constitutional violations.  Therefore, if Sheriff Brown is to be held liable, he must have failed to correct a

---

[45] As a threshold matter, a defendant must demonstrate that he was acting within the scope his discretionary authority at the time of the alleged constitutional violation.  Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012).  Once the defendant does so, the burden shifts to the plaintiff to demonstrate that the defendant violated a clearly established constitutional right.  Id.  There is no question Sheriff Brown was acting in the scope of his discretionary authority; thus the burden is Keith's to shoulder.

24

widespread pattern of constitutional violations or he must adopted a custom or policy that deprived Cook of his constitutional rights.  Cottone, 326 F.3d at 1360.[46]

We start by squeezing down Keith's claim.  Keith cites seventeen factors, which, she argues, establish that the DeKalb County Jail presented a substantial risk of serious harm to inmates.[47]  However, of those seventeen factors, only a few can be traced to Sheriff Brown.  That is, Keith has failed to demonstrate that Sheriff Brown was subjectively aware of many of the factors, and that he consciously disregarded a substantial risk of serious harm.  Many of these factors are, therefore, irrelevant to our analysis of Sheriff Brown's conduct.

---

[46] Keith does not allege that Sheriff Brown directed his subordinates to act unlawfully or that he knew that his subordinates would act unlawfully and that he failed to stop them from doing so.

[47] The alleged factors are: (1) failure to supervise inmates, (2) failure to adhere to Jail policy regarding control inmate movement within 3SW, including inadequate training, (3) failure to segregate convicted inmates from pretrial inmates, (4) failure to segregate mental health inmates with violent history from those with nonviolent histories, (5) failure to separate mental health inmates charged with violent crimes from nonviolent crimes, (6) adhering to de facto policies that conflict with written Jail policies, (7) detention officers leaving their post unattended for personal reasons, (8) tower officers distracted and using cell phones, (9) allowing untrained officers to make professional mental health judgments regarding potential mental health changes in diagnosed mental health inmates, (10) allowing mental health inmates with violent histories to determine which cells they would be housed, (11) failure to perform weekly inspections of Jail to ensure policies were followed, (12) failure to consistently discipline mental health inmates when they are involved in physical altercations, (13) the fact that the inside of prison cells are out of earshot and eyesight of housing tower, (14) training detention officers in a manner contrary to written policies, (15) failure to respond to in-cell call buttons, (16) failure to alert mental health professionals through referral process, and (17) failure to formally document and report all instances of inmate-on-inmate assault.

25

For example, Keith cites the fact that Corporal Mayo was using his personal cell phone at the time Adan attacked Cook.  But the evidence shows that at the time of Cook's death, Sheriff Brown had instituted a policy banning cell phone use by employees within the Jail.  While Corporal Mayo may have acted contrary to the Jail policy, Keith presents no evidence that this was a widespread problem or that Sheriff Brown was aware that employees routinely violated the policy and that he failed to correct the problem.  Cf. Goebert v. Lee Cnty., 510 F.3d 1312, 1332 (11th Cir. 2007) ("Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations.").  By not showing that Sheriff Brown was subjectively aware of this factor, Keith fails to establish the factor's relevance to her deliberate indifference claim.[48]

_____

[48] Similar stories can be told for the allegations that Corporal Mayo disengaged another inmate's in-cell call button indicator in violation of policy, that detention officers were trained contrary to written Jail policy, that detention officers failed to document every instance of inmate-on-inmate violence, that detention officers failed to discipline inmates involved in violence at the Jail, that detention officers left the floor for personal reasons, that detention officers failed to routinely make referrals to MHM professionals, that detention officers ignored in-cell call alerts, and that supervisors failed to conduct weekly inspections of the Jail.  Sheriff Brown or his subordinates had issued policies with respect to all of these factors; the policies were not uniformly adhered to.  These are incidents of subordinates failing to follow the written policy directives of Sheriff Brown, but, as stated previously, supervisors cannot be held liable under § 1983 on a theory of vicarious liability.  Cottone, 326 F.3d at 1360.  In all of these instances, Keith fails to present evidence that Sheriff Brown "had actual or constructive notice of

26

Distilled to its essence, Keith's main allegation is that Sheriff Brown created a substantial risk of harm by relying on MHM staff's determination—that an inmate did not pose a substantial risk of harm to other inmates—in housing the inmate. Of course, Keith does not overtly make this claim; to do so would reveal that Keith's actual complaint is with MHM staff's independent (and, in retrospect, possibly mistaken) determination that Adan did not pose a risk of harm to other inmates. Instead, Keith argues that Sheriff Brown created a substantial risk of serious harm by "failing" to segregate mental health inmates with violent histories from those with nonviolent histories and by "failing" to separate mental health inmates charged with a violent crime from those charged with a nonviolent crime.[49] In effect, Keith aims to hold Sheriff Brown liable for <u>not</u> disregarding the expert medical opinions of MHM staff. That is, because MHM staff could mistakenly determine that a mental health inmate does not pose a risk of harm to

---

a flagrant, persistent pattern of violations" of the Jail's written policies. <u>Goebert,</u> 510 F.3d at 1332. At most, and as the District Court found, these are negligent acts by subordinates. Therefore, these factors are irrelevant to our determination of whether Sheriff Brown is liable under § 1983.

[49] Keith also argues that the Jail created a substantial risk of serious harm by failing to separate convicted inmates from pretrial inmates. This fact is irrelevant to the present appeal because both Cook and Adan were pretrial inmates.

27

other inmates when in fact he does, Sheriff Brown must take affirmative steps to avoid the mistake.[50]

Keith's theory of liability does not square with the law.  Simply put, the law does not require that Sheriff Brown ignore the determination and recommendation of MHM staff.  A sheriff cannot be held liable for failing to segregate mental health inmates whom trained medical personnel have concluded do not present a risk of harm to themselves or others.[51]  Moreover, even if we assume that Sheriff Brown violated Cook's constitutional rights, Keith has not demonstrated that it is "clearly established" that a sheriff has a constitutional obligation to disregard the medical expertise of the very contractors he has hired to ensure that the inmates' mental health is tended to.  Cf. Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002) ("For a constitutional right to be clearly established, its contours must be sufficiently clear . . . .  that in the light of pre-existing law the unlawfulness [of an official's actions] must be apparent.")

---

[50] One wonders whether Keith would advocate for a policy of locking all mental health pretrial inmates in individual cells, regardless of MHM's determination.  That would seem to be the only method of ensuring that mental health inmates do not injure each other.

[51] One could imagine a scenario in which medical staff is recklessly incompetent or consistently misdiagnoses inmates, such that a sheriff's reliance on such evaluations might constitute deliberate indifference of a substantial risk of serious harm.  However, that is not this case.  Keith has not alleged, and there is no evidence to suggest, that MHM was recklessly incompetent or consistently misdiagnosing mental health inmates at the Jail.

28

(citation omitted) (internal quotation marks omitted). The reason Keith has failed to present case law supporting her argument is because there is none.

Keith also faults Sheriff Brown for the Jail's policy of allowing detention officers to relocate mental health inmates to different cells within the same pod, citing evidence that since at least 2004, detention officers were trained to disregard the policy of reporting cell relocations to classification officers. However, Jail policy requiring detention officers to alert MHM staff or classification officers remained in effect, and Keith does not present evidence that Sheriff Brown was subjectively aware that the policy was disregarded on a widespread basis.[52]

Keith argues that Jenkins v. DeKalb County, Ga., 528 F. Supp. 2d 1329 (N.D. Ga. 2007), aff'd 307 F. App'x 390 (11th Cir. 2009), demonstrates that Sheriff Brown was on notice that the Jail and practices within the Jail posed a substantial risk of serious harm to inmates. Jenkins involved facts similar to those in this case. In July 2004, a pretrial inmate at the DeKalb County Jail (Jenkins) was killed by another inmate (Smith) when the two were placed in the same cell.[53] Id. at 1331–32. The killing occurred in 3SW pod 600, the same pod where Cook

---

[52] In his deposition, Sheriff Brown acknowledged officers may not follow the policy in every instance, but he stated that failing to report cell relocations violates policy and that officers in violation could be disciplined for such actions.

[53] Unlike the current case, in Jenkins, the roles were switched. Jenkins (the victim) was arrested on two counts of aggravated assault, whereas Smith (the assailant) was detained for possession of marijuana.

29

met his death.  Jenkins was known to have a history of physical and verbal outbursts, and the evidence demonstrated that Smith was involved in an unprovoked assault within four hours of being taken to the Jail.  Id. at 1331–32. From the District Court's opinion in Jenkins, we know Smith had attempted to escape from the intake area, and "the screening nurse [at classification] made the decision to assign Smith to housing pod 3SW where special needs inmates were housed."  Id. at 1332.  Smith had been assigned to a different cell, but "[f]or reasons which are still unclear," he ended up in the same cell as Jenkins.  Id.  The Sheriff's Office conducted an investigation into Jenkins's death, as it did in Cook's case.  The report concluded that "no evidence was obtained that suggested that [Jail personnel] were negligent in the death of inmate Jenkins. . . . [A]ll of the responding officers acted reasonably . . . . Therefore, [Jail personnel] are in compliance with the rules and regulations and did not violate any policy."  Record, no. 106-2, at 13 (Office of Professional Standards Report at 9 (2004)).

Jenkins's estate filed a § 1983 action against the county and named Sheriff Brown as a defendant.  As part of the litigation, Sheriff Brown was deposed and admitted that "there are problems from time to time with [inmates] losing and destroying their armbands."  Jenkins, 528 F. Supp. 2d at 1335 (quoting Brown's deposition).  The District Court in Jenkins granted summary judgment in favor of Sheriff Brown, concluding that the plaintiff failed to produce evidence that Sheriff

30

Brown was on notice of a widespread practice of housing vulnerable inmates with violent and assaultive inmates and because there was no evidence that he failed to adequately train or supervise detention officers. Id. at 1335–36. The plaintiffs did not appeal the District Court's grant of summary judgment as to the Sheriff.[54]

Seizing on Jenkins, Keith argues that Sheriff Brown was aware of and acquiesced to the substantial risk of serious harm to inmates that is created by failing to segregate mental health inmates and by allowing detention officers to move inmates in 3SW pod 600 to different cells in the pod. We disagree. Jenkins demonstrates that in an isolated incident, the practice of moving an inmate with a known propensity for violence to a cell different than the one listed on the inmate's armband and in which another known-to-be-violent inmate already resided, led to the death of an inmate. This incident, while tragic, is not evidence of widespread and flagrant abuse sufficient to alert Brown to a substantial risk of serious harm. In fact, the Office of Professional Standards Report concluded that nobody at the Jail, from medical staff to detention officers, acted negligently or violated Jail policy. Therefore, it is difficult to conclude that Sheriff Brown was on notice of a substantial risk of serious harm caused by deficient policies in the Jail.

---

[54] The District Court had also granted summary judgment for the three detention officers who were directly involved in the incident. Jenkins, 528 F. Supp. 2d at 1336–39. The plaintiffs appealed this decision, and we affirmed the district court in an unpublished opinion. Jenkins v. DeKalb Cnty., Ga., 307 F. App'x 390 (11th Cir. 2009).

31

Moreover, even if <u>Jenkins</u> were sufficient to put Sheriff Brown on notice, a Jail policy permitting detention officers to move a mental health inmate to a different cell, when trained medical personnel have determined that the inmate does not pose a threat to others, does not violate clearly established constitutional law. Cf. <u>Sherrod v. Johnson</u>, 667 F.3d 1359, 1363 (11th Cir. 2012) ("For the law to be clearly established, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." (internal quotation marks omitted)). Keith fails to direct us to any case law on point, and that is because none exists.[55]

B.

Keith's alternative claim for relief—that Sheriff Brown failed to adequately train the detention officers—implicates a different, albeit very similar, rule: under

---

[55] Rather than respond directly to Sheriff Brown's argument that there is no clearly established law on the cell-assignment issue, Keith relies on precedent wherein this circuit denied qualified immunity based on multiple factors, some of which mirror the seventeen factors Keith cites in her brief. However, as discussed previously, many of the factors Keith cites cannot be tied to Sheriff Brown and are therefore irrelevant. Cf. <u>Cottone</u>, 326 F.3d at 1355 (considering a Rule 12(b)(6) motion to dismiss based on qualified immunity and thus accepting the complaint's allegations as true); <u>Marsh</u>, 268 F.3d at 1023 (same); <u>Hale v. Tallapoosa Cnty.</u>, 50 F.3d 1579, 1583 (11th Cir. 1995) (denying a motion for summary judgment that raised a qualified immunity defense where the sheriff testified that he was aware of the factors the plaintiff alleged in support of his claim). Keith's failure to meet Sheriff Brown's argument that there is no law squarely on-point is fatal to her argument that Sheriff Brown is not entitled to qualified immunity.

32

§ 1983, a supervisor can be held liable for failing to train his or her employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989); see also Belcher v. City of Foley, Ala., 30 F.3d 1390, 1397 (11th Cir. 1994) ("A supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused the injury of which the plaintiff complains." (internal quotation marks omitted)).  Thus, a plaintiff alleging a constitutional violation premised on a failure to train must demonstrate that the supervisor had "actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights," and that armed with that knowledge the supervisor chose to retain that training program. Connick v. Thompson, ___ U.S. ___, ___, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011).

To establish that supervisor was on actual or constructive notice of the deficiency of training, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary." Id. (internal citations omitted).  Here, Keith does not allege, much less establish, a pattern of similar constitutional violations

33

by untrained employees.  The Jenkins incident did not provide the requisite notice

to Sheriff Brown that the training provided to detention officers was

constitutionally deficient.  Cf. id.[56]  Even if we were to assume that Keith

established a pattern of constitutional violations, it is not clear how training

detention officers to follow the Jail policy regarding the movement of mental

health inmates would eliminate the constitutional problem.  Cf. Am. Fed'n of

Labor & Cong. of Indus. Orgs. v. City of Miami, Fla., 637 F.3d 1178, 1189 (11th

Cir. 2011) ("[A] plaintiff must also demonstrate that constitutional violations were

likely to recur without training.").  As previously recounted, Cook and Adan were

in pod 600, a pod for mental health inmates whom MHM staff determined did not

pose a risk of harm to self or others.  MHM staff members were responsible for

placing inmates in pod 600, and Dr. Brickhouse testified that the movement of

mental health inmates within a pod (i.e., from cell to cell) did not present a

problem from a mental health standpoint.  Moreover, cells in 3SW pod 600 were

---

[56] Although the Supreme Court has left open the possibility that a single incident may prove sufficient to hold a supervisor liable for a failure to train, see City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n.10, 109 S. Ct. 1197, 1205 n.10, 103 L. Ed. 2d 412 (1989), we decline to use this case as the vehicle for flushing out the Supreme Court's hypothetical basis for § 1983 relief.  In Canton, the Supreme Court hypothesized a police force that gives officers firearms but fails to provide any training regarding the constitutional limitations on the use of deadly force, concluding that the need to provide such training would be "so obvious" that the failure to do so could amount to deliberate indifference.  Id.  It is not similarly obvious that the "failure to train" at issue in this case amounts to deliberate indifference.

equipped with two beds.  Mental health inmates in that pod were likely to end up in a cell with another inmate; no amount of training regarding the need to alert classification officers to a cell change would change that fact.  While there may have been ways in which the Sheriff Brown could have improved the training of officers, the deliberate indifference standard requires a showing of more than gross negligence.  See Canton, 489 U.S. at 388, 109 S. Ct. at 1204; see also Connick, ___ U.S. at ___, 131 S. Ct. at 1363 ("[Section 1983] does not provide plaintiffs or courts carte blanche to micromanage local governments throughout the United States.").

Finally, assuming that Keith has adequately established that Sheriff Brown committed a constitutional violation by failing to train the detention officers at the Jail, Keith has not established that Sheriff Brown violated clearly established law.  Because it was not clearly established that failing to segregate mental health inmates violated Cook's constitutional rights, Sheriff Brown's "failure" to train detention officers to segregate such inmates did not amount to a constitutional violation.  Cf. Loftus, 690 F.3d  at 1204.  Therefore, Sheriff Brown would be entitled qualified immunity on that ground as well.

As the Supreme Court has indicated, "[a] [supervisor's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, ___ U.S at ___, 131 S. Ct. at 1359.  Keith's claim that Sheriff

35

Brown violated Cook's constitutional rights by failing to adequately train detention officers is especially tenuous because not only does she fail to demonstrate that Sheriff Brown was on notice, she also fails to demonstrate how "better training" would have prevented the incident leading to Cook's death.  Therefore, like her claims discussed in subpart A, her failure to train claim must also fail.

## V.

In conclusion, Keith has failed to demonstrate that Sheriff Brown violated Cook's constitutional rights.  Sheriff Brown is therefore entitled to summary judgment on her § 1983 claims.  The District Court's denial of Sheriff Brown's motion for summary judgment is, accordingly,

REVERSED.