[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14026

_____

D.C. Docket No. 7:16-cv-01201-LSC

WILLIE HILL,
RUSSEL SMITH,
PETER COLLINS,
WILBUR CREAR,
DEAN DAVIDSON,
VERGE HENTON,
JESSE BROWN,
DAVID HOLMES,
ROBERT HUDSON,
SHIRLEY KENNARD,
ROY MCLIN,
SHIRLEY MEDLEY,
MARILYN MITCHELL,
BILL MOORE,
MARK PARKER,
ROSALIND PETTIGREW,
ERIC SHAW,
TERRY CARTER,
RONALD WALLACE,
MICHAEL WATKINS,
WINIFRED WELLS, SR.,
JERRY WAYNE WILLIAMS,
RONNIE WOODS,

Plaintiffs - Appellants,

versus

EMPLOYEE BENEFITS ADMINISTRATIVE COMMITTEE OF MUELLER
GROUP LLC,
APPEALS COMMITTEE OF THE EMPLOYEE BENEFITS
ADMINISTRATIVE COMMITTEE OF MUELLER GROUP LLC,
MUELLER GROUP LLC PENSION PLAN FOR SELECTED
EMPLOYEES,
MUELLER GROUP LLC,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 24, 2020)

Before BRANCH and MARCUS, Circuit Judges, and HUCK,[*] District Judge.

MARCUS, Circuit Judge:

Willie Hill and twenty-two other appellants (the "employees") are hourly workers at a pipe factory in Bessemer, Alabama. They participate in a pension plan that provides Special Early Retirement ("SER") benefits if they are laid off or terminated by a permanent plant shutdown before their normal retirement age, after meeting certain age and service requirements. The employees meet the age and service requirements -- each has worked at the factory for at least eighteen years and each is at least fifty-three years old.

---

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

On April 1, 2012, the former parent company (Mueller Group, LLC) of the entity that employs the workers (U.S. Pipe and Foundry Company ("U.S. Pipe")) sold its interest in U.S. Pipe to another company (USP Holdings). Before and after the sale, the factory remained continuously operational and the employees remained employed in their same jobs. Nevertheless, the employees claim that they are entitled to SER benefits because the sale effected either a layoff or a permanent plant shutdown. They brought this action under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") found in 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3) to challenge the plan administrator's denial of those benefits.

The employees' theory fails because they were not laid off. And they were not terminated by a permanent plant shutdown because the Bessemer plant where they work did not shut down -- even for a single day. We affirm.

## I.

At all times relevant to this litigation, the employees were longstanding hourly workers at a factory owned by U.S. Pipe. At U.S. Pipe, the employees participated in a pension plan for hourly employees. The plan provided for ordinary retirement benefits upon reaching age 65 and Special Early Retirement benefits under specified circumstances:

> [A] Participant whose Termination Date occurs prior to his Normal
> Retirement Age because he is (1) laid off and not recalled within 2

3

years, or (2) terminated by permanent plant shutdown, . . . and (4) who has both attained the age of 53 years as of the applicable shutdown or layoff date and completed at least 18 years of Service as of his Termination Date shall be eligible for a Special Early Retirement Pension.[1]

This pension plan defines "Termination Date" as "[t]he date of an Eligible Employee's termination of employment with the Employer," which was defined as "United States Pipe and Foundry Company or any successor thereto.  The Employer is the Plan sponsor."  The U.S. Pipe pension plan does not define "Layoff," "laid off," or "permanent plant shutdown."  At all relevant times, the employees met the age and service conditions for SER benefits: each was at least fifty-three years old and each had worked at the Bessemer plant for at least eighteen years.

In 2009, Mueller Group, LLC ("Mueller"), a nationwide manufacturer of water transport products, purchased all membership interests in U.S. Pipe.  As part of the purchase, Mueller incorporated verbatim U.S. Pipe's pension plan for hourly employees into its own plan, the Mueller Group, LLC Pension Plan for Selected Employees (the "Mueller Plan"), as "Part M."  In 2010, Mueller made a handful of clarifying amendments to Part M, including deleting the sentence defining "Employer" as "the Plan sponsor," so that the definition read only "United States

---

[1] An omitted condition offers these benefits in cases of extended illness, which is not at issue in this case.

Pipe and Foundry Company or any successor thereto." The Mueller Plan qualifies as a defined benefit plan governed by ERISA, 29 U.S.C. § 1001 et seq., and was administered by the Employee Benefits Administrative Committee of Mueller Group, LLC ("EBAC"). The decisions of EBAC are appealable to an Appeals Committee. The text of the Mueller Plan granted EBAC "discretion to interpret the Plan, including any ambiguities [t]herein, and to determine the eligibility for benefits under the Plan in its sole discretion."

In 2012, Mueller entered into a purchase agreement with USP Holdings Inc. ("USP") to sell its interest in U.S. Pipe. Under the terms of the purchase agreement, Mueller agreed to freeze and fully vest all benefits provided for by Part M and to remain liable for paying those benefits after the sale. USP agreed that outstanding collective bargaining agreements would continue to govern the hourly employees' terms and conditions of employment. In anticipation of the sale, Mueller had already frozen the accrual of credited years of service in 2011, and it amended the Mueller Plan in the weeks after signing the purchase agreement to vest benefits and prepare for payment. In pertinent part, this amendment provided that employees "shall be deemed to experience a Termination Date on the Closing Date" of Mueller's transaction with USP Holdings.

As provided for by the purchase agreement, the sale closed Sunday, April 1, 2012, and U.S. Pipe became a wholly owned subsidiary of USP. At the Bessemer

plant, little changed on the day of the closing. The factory operated continuously -- manufacturing the same products -- before and after the sale, and each of these workers remained employed in the same capacity for at least the next two years.[2] However, the employees were no longer eligible to purchase stock through Mueller's employee stock purchase plan, and USP provided health and welfare benefits from different providers than Mueller had used.

In 2014, the employees (having learned that some salaried employees were being paid SER benefits after the 2012 sale) made claims to EBAC for SER benefits.[3] They argued that the 2012 sale from Mueller to USP constituted either a layoff or a permanent plant shutdown, which, when coupled with the undisputed fact that the employees met the age and service requirements for SER benefits, would entitle them to immediate payment of retirement benefits. EBAC denied the claims on the ground that the employees' "termination" for purposes of the Mueller Plan, which occurred when U.S. Pipe was sold, did not qualify as a "layoff" or "permanent plant shutdown." The employees appealed that determination to the Appeals Committee, which agreed with EBAC in a thorough letter, explaining that the employees had not "experienced either of the relevant

---

[2] Russell Smith became a salaried employee in 2011.

[3] The pensions of salaried employees were governed by another part of the Mueller Plan, Part N. Like Part M, Part N provided for SER benefits, but unlike Part M, they were not triggered by a layoff or permanent plant shutdown. Rather, they required only that the employee reach a certain age and number of years of service.

pre-requisites for eligibility" because they "did not experience a layoff" and "the U.S. Pipe plant was not permanently shut down."

The employees then filed this lawsuit in the United States District Court for the Northern District of Alabama, naming Mueller, the Mueller Plan, EBAC, and the Appeals Committee as defendants. Their first claim seeks payment of wrongfully denied pension benefits under 29 U.S.C. § 1132(a)(1)(B), on the theory that the April 1, 2012, sale either laid them off or terminated them by a permanent plant shutdown, either condition of which would entitle them to SER benefits. The second claim seeks SER benefits under 29 U.S.C. § 1132(a)(3), arguing on the same grounds that Mueller, the Plan, EBAC, and the Appeals Committee violated 29 U.S.C. § 1054(g), ERISA's "anti-cutback" provision. After discovery, the parties filed cross motions for summary judgment. The district court granted defendants' motion for summary judgment because it found the defendants' interpretation of the Plan to have been reasonable.

This timely appeal followed.

## II.

We review de novo a district court's grant of summary judgment. See Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan, 833 F.3d 1299, 1306 (11th Cir. 2016). "Summary judgment is appropriate where there is 'no genuine issue as to any material fact and the moving party is entitled to judgment

as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(a)).  We may affirm "for any reason supported by the record, even if not relied upon by the district court." United States v. Chitwood, 676 F.3d 971, 975 (11th Cir. 2012) (quotation omitted).

A.

The employees' first claim arises under 29 U.S.C. § 1132(a)(1)(B), which gives beneficiaries of ERISA-governed pension plans a cause of action "to recover benefits due to [them] under the terms of [their] plan."  29 U.S.C. § 1132(a)(1)(B). We review a claim for the wrongful denial of benefits by an administrator under a long-established, six-step framework:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether [it] was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and [it] was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review [its] decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if [the administrator] operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

8

(6)If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Alexandra H., 833 F.3d at 1311–12 (quoting Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1355 (11th Cir. 2011) (per curiam)).

"At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry." HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001), implied overruling on other grounds recognized by Doyle v. Liberty Life Assurance Co. of Bos., 542 F.3d 1352, 1359 (11th Cir. 2008). Thus, where, as here, there is no claim that the administrator labored under a conflict of interest, at most only the first three steps of this framework are implicated. At step two, it is undisputed that the Mueller Plan gave EBAC discretion to determine eligibility for benefits.

The district court concluded that Mueller's decision to deny SER benefits was de novo incorrect because of perceived inconsistencies in the reasoning of EBAC and the Appeals Committee in their denial letters to the employees. As we see it, however, this case should be decided at the first step rather than reaching for the third step as the district court did. In conducting de novo review of a plan administrator's decision at step one, a court must look only at the text of the plan in light of the facts presented in the case. Cf. Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1232 (11th Cir. 2006) ("'Wrong' is the label used by our

9

precedent to describe the conclusion a court reaches when, <u>after reviewing the plan documents and disputed terms</u> <u>de novo</u>, the court disagrees with the claims administrator's plan interpretation." (emphasis added and quotation omitted)). Because the court analyzes the participants' eligibility as if it were the administrator in the first instance, what the actual administrator said in justifying its decision is irrelevant to this step one analysis. See Melech v. Life Ins. Co. of N. Am., 739 F.3d 663, 672 (11th Cir. 2014) ("[B]ased on the evidence before the administrator at the time it made its decision, the court evaluates whether it would have reached the same decision."); Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008) ("The court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator."). But even if we proceeded to step three, as the district court did, we would still conclude that EBAC's interpretation of the Mueller Plan documents was a reasonable one.

We hold that EBAC's decision was correct under <u>de novo</u> review. Pursuant to the unambiguous terms of the Mueller Plan, the employees simply did not qualify for SER benefits. To qualify, the employees either had to be laid off or terminated by a permanent plant shutdown. These employees were neither laid off, because they kept their same jobs at the same plant, nor were they terminated by a permanent plant shutdown, because the Bessemer plant never shut down. Thus,

10

the employees are not eligible for SER benefits, and EBAC's denial of those benefits was the correct interpretation of the Mueller Plan.

1.

We begin at the first step, reviewing EBAC's decision de novo.  In interpreting plan documents, we look first to the text of the plan.  See Bedinghaus v. Modern Graphic Arts, 15 F.3d 1027, 1029 (11th Cir. 1994).  The Mueller Plan does not define the phrase "laid off."  Therefore, we must discern its ordinary meaning.  See Alexandra H., 833 F.3d at 1307.  In its ordinary meaning, losing one's job, at least temporarily, is a prerequisite of having been laid off.  We know this because the loss or suspension of one's job is a feature of the phrase's definition.  See, e.g., Layoff, Black's Law Dictionary (11th ed. 2019) (defining "layoff" as the "termination of employment at the employer's instigation, usu[ally] through no fault of the employee"); Lay off, MacMillan Dictionary, https://www.macmillandictionary.com/us/dictionary/british/lay-off_1 (last visited Aug. 13, 2020) (defining to "lay off" as "to end someone's employment, especially temporarily, because there is not enough work for them"); Lay Off, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/lay-off (last visited Aug. 13, 2020) ("If workers are laid off, they are told by their employers to leave their job, usually because there is no more work for them to do.").  The employees did not lose their jobs; they were not laid off.

In April 2012, Willie Hill would surely not have announced to his family, with the gravity such an occasion may demand, that he had been laid off, let go, or terminated at the Bessemer plant. No doubt the date of his ostensible layoff was much like any other evening on which he came home from the job he had worked for the past eighteen years and had every intention of returning to the next morning. Being laid off is a big deal for people because it means that they have lost their job and, for at least some period of time, their source of income. Maybe they will be able to land another job, and maybe they will be recalled to the job they previously had. But the change in circumstances visited by a job termination is obvious, clear, and frequently a defining moment in the employment history of an employee. Moreover, because of the significance attached to a termination or layoff, it makes sense for employers to offer some kind of assurance that employees will be taken care of in the event of layoffs -- especially employees who are particularly unlikely to find another job or whose discharge was particularly without cause. That is exactly what Part M of the Mueller Plan did -- it offered early retirement benefits to an employee, in the unfortunate event of a layoff, who was especially unlikely to find another job (on account of age) and for whom the impact was especially severe (because the employee worked for the company for a long time).

12

Rather than rebut the intuitive observation that to have been laid off one must have lost one's job, the employees offer an almost metaphysical argument based on the nomenclature of the corporation that employed them -- before the sale, the employees were employed by Mueller, which owned U.S. Pipe, and after the sale, they were employed by USP.  So, the argument goes, even if they kept their jobs at the Bessemer plant, they lost their jobs with Mueller, and because this loss was through no fault of their own, they were "laid off."  This is not how people ordinarily use the phrase "laid off."  Each employee kept the same job, at the same plant, with the same consideration.  No one would describe himself as having been laid off simply because the employer's corporate nomenclature changed, especially when everything else remained the same.

The basic understanding that being "laid off" for the purpose of deriving benefits under an ERISA-governed plan requires losing one's job is amply supported by the case law.  See Blank v. Bethlehem Steel Corp., 926 F.2d 1090, 1093 (11th Cir. 1991); see also Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1276 (10th Cir. 1994) (explaining that "inhering in the term 'laid off' is the understanding the affected employee no longer holds the same job he did prior to being 'laid off'"); Bradwell v. GAF Corp., 954 F.2d 798, 800–01 (2d Cir. 1992) (declining to award severance "in the context of the sale of a business where the buyer retains the former owner's employees"); Rowe v. Allied Chem. Hourly

13

Emps.' Pension Plan, 915 F.2d 266, 269 (6th Cir. 1990) (affirming that "separation from one employer followed by immediate employment with a successor employer does not constitute a layoff").

In Blank, for instance, we confronted facts similar to those found in this case. There, a pension plan provided benefits for employees who met certain age and service requirements and "whose continuous service is broken by reason of a layoff or disability." 926 F.2d at 1092. The plaintiffs' employer sold the factory at which the plaintiffs worked as "an ongoing business" and they continued to work in the same capacity after the sale. Id. But, like here, they claimed that the sale itself constituted a layoff and entitled them to benefits. Id. We rejected the argument, observing that "an employee who continues employment with a purchasing corporation has not experienced a layoff by the original employer." Id. at 1093.

The cases cited by the employees largely construed phrases other than the term "layoff" and thus provide little guidance today. For example, in Yochum v. Barnett Banks, Inc. Severance Pay Plan, participants in a pension plan were not entitled to severance benefits as the result of a merger if they "declined a written offer of comparable employment." 234 F.3d 541, 544–45 (11th Cir. 2000) (per curiam). In that case, the plaintiff turned down the offer of a different job with different responsibilities and different benefits with the purchasing company. Id. at

543. Because this was not an offer of "comparable employment," we held that he was still entitled to severance benefits. Id. at 546. But this holding turned on the meaning of the phrase "comparable employment," and not "laid off." Similarly, in Bedinghaus, the plan at issue provided benefits where an employee was "discharged as a full-time staffer for reasons other than cause," 15 F.3d at 1029, which we held could encompass the sale of a subsidiary as an ongoing business, id. at 1030. But "discharged as a full-time staffer for reasons other than cause" differs from being "laid off" in several critical ways. For one, the term "discharged" encompasses a broader category of job loss than does "laid off," which typically refers to job loss caused by lack of work or corporate restructuring. For another, the phrase in Bedinghaus specified that the discharge be "as a full-time staffer," while "laid off" refers to the complete loss of employment.

## 2.

Inasmuch as the employees were not laid off, they could only qualify under the Mueller Plan for SER benefits if they were terminated by a permanent plant shutdown. The Mueller Plan does not define "permanent plant shutdown," either, so again we must discern its ordinary meaning. See Alexandra H., 833 F.3d at 1307. A "shutdown" is "the cessation or suspension of an operation or activity." Shutdown, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/shutdown (last visited Aug. 13, 2020); see also Shutdown,

15

MacMillan Dictionary,

https://www.macmillandictionary.com/us/dictionary/american/shutdown (last

visited Aug. 13, 2020) (defining "shutdown" as "an occasion when a machine or

factory stops working temporarily"); To shut down, Oxford English Dictionary,

https://www.oed.com/view/Entry/179051?rskey=yALWbO

&result=1#eid1304095215 (last visited Aug. 13, 2020) (defining "to shut down" as

to "close (a manufactory)" or "stop working").  And a shutdown is "permanent" if

it "continu[es] or endur[es] without fundamental or marked change."  Permanent,

Merriam-Webster Dictionary, https://www.merriam-

webster.com/dictionary/permanent (last visited Aug. 13, 2020); see also

Permanent, MacMillan Dictionary,

https://www.macmillandictionary.com/us/dictionary/american/permanent_1 (last

visited Aug. 13, 2020) (defining "permanent" as "happening or existing for a long

time or for all time in the future"); Permanent, Oxford English Dictionary,

https://www.oed.com/view/Entry/141184?rskey=QQUXv1&result=1#eid (last

visited Aug. 13, 2020) ("Continuing or designed to continue or last indefinitely

without change; abiding, enduring, lasting, persistent.  Opposed to temporary."

(emphasis in original)).

Thus, even if we were to assume that the employees had in fact been

terminated by their employer -- and we reject that assumption -- the termination

16

still would not have been on account of a permanent plant shutdown. This is because the plant never shut down. It is undisputed that the Bessemer plant never shut down in the ordinary meaning of that term -- that is, it continued operating and making the same products after the sale just as it had before. The undisputed record indicates that the sale of the plant from Mueller to USP resulted in no disruption to operations at the plant. On the Monday after the sale (which closed on a Sunday), the employees came to the same factory and did the same jobs they had done the previous Friday, and did what they had done for at least the past eighteen years. No one would look at this continuously operational plant and describe it as having been "shut down," much less "permanently" so.

Moreover, it is not a plausible reading of the relevant language to say that the phrase "terminated by a permanent plant shutdown" turns on corporate nomenclature or structure rather than on the reality that the Bessemer plant never ceased its operations. If those who drafted the SER provisions intended them to apply to a sale of the plant, they could have said so in any one of many clear ways -- for example, they might have written that SER benefits are also triggered when a participant's "employment relationship with the Plan sponsor is terminated as a result of a sale of the Plan sponsor's interest in the plant." But instead, they wrote "terminated by a permanent plant shutdown." To have been terminated "by a permanent plant shutdown," a permanent plant shutdown must have occurred. The

17

language of the Mueller Plan thus makes clear that it is the occurrence of a plant

shutdown, not the sale of Mueller's operations at the plant, that triggers eligibility

for SER benefits. The plant did not shut down, regardless of the corporate

ownership. And the employees were not terminated by a permanent plant

shutdown.

Not surprisingly, the few courts that have faced similar arguments have

rejected them. See Blank, 926 F.2d at 1094–95 (noting there is no shutdown where

a purchaser continues to operate a business with the same employees in

substantially the same positions); see also Brandis v. Kaiser Aluminum & Chem.

Corp., 47 F.3d 947, 949 (8th Cir. 1995) (confirming there is no shutdown where

"operations . . . continue[] uninterrupted"); Anderson v. Ideal Basic Indus., 804

F.2d 950, 953 (6th Cir. 1986) (finding no "shutdown" as to employees of a factory

that had been sold who chose to continue to work for the buyer).

In sum, because the employees were neither laid off nor terminated by a

permanent plant shutdown, they were not entitled to SER benefits under the

language of the Mueller Plan. EBAC's decision to deny those benefits was de

novo correct, and its decision must be affirmed at step one.

### 3.

However, even if we were to proceed past step one, we would still affirm the

denial of benefits because plainly EBAC had discretion to determine eligibility

18

under the Mueller Plan and its interpretation was a reasonable one. There is no dispute that the Mueller Plan granted EBAC discretion to interpret the Mueller Plan's terms and determine eligibility for benefits. So even if we assume that EBAC's interpretation was wrong on <u>de novo</u> review, we would still be obliged to defer to its determination unless we could find it unsupportable by reasonable grounds under the "more deferential" arbitrary and capricious standard of review. <u>Alexandra H.</u>, 833 F.3d at 1311; <u>see also</u> <u>Blank</u>, 926 F.2d at 1093 ("In applying the arbitrary and capricious standard to a plan administrator's decision, the district court's role is limited to determining whether the contested interpretation was made rationally and in good faith.").

On its face, EBAC's reading of the Mueller Plan was amply supported by reasonable grounds. Even if we were persuaded by the nice distinctions the employees have offered in giving meaning to the words "laid off" and "terminated by a permanent plant shutdown," we could not say that rejecting them was beyond reason. At a bare minimum, it would not be unreasonable to find that an employee could not have been laid off without losing his job or that an employee could not be terminated by a permanent plant shutdown when the plant remained wholly operational. Thus, even if EBAC's decision was wrong, the employees still would not be entitled to the benefits they seek.

19

The employees resist this conclusion, offering two additional arguments, neither of which is persuasive. First, they claim that EBAC and the Appeals Committee did not rest their denial of SER benefits on the grounds that the employees were neither laid off nor terminated by a permanent plant shutdown, and that we ought not to defer to a "post hoc rationalization," even if it is facially reasonable. The problem with the argument is that it is belied by the record. EBAC's denial letter, admittedly terse, explained that the Mueller Plan provides benefits only to those participants who were "(1) laid off and not recalled within 2 years" or "(2) terminated by permanent plant shutdown." The employees, however, "were terminated under the plan due to the sale of U.S. Pipe." And this was "not one of the reasons for termination that would make [them] eligible" for receipt of the SER benefit. Similarly, the Appeals Committee's more fulsome decision denied the employees' appeals because they had not "experienced either of the relevant pre-requisites for eligibility for" the SER benefit. They "did not experience a layoff"; nor was the plant "permanently shut down." Thus, the Appeals Committee concluded, the employees were "not eligible for" SER benefits. These rationales are no different from the arguments we have found convincing here.

Second, the employees suggest that the district court should not have proceeded to step three and reviewed EBAC's decision for reasonableness after

20

concluding that it was de novo wrong.  As discussed already, however, we think this case can be decided at step one, and we do so today.  But in any event, the employees' argument misapprehends our precedent -- we will only proceed to step three after concluding that the administrator's decision was de novo wrong.  See HCA Health Servs., 240 F.3d at 993 ("At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry."); see also Blankenship, 644 F.3d at 1355 (explaining that we only "determine whether 'reasonable' grounds supported" the decision where we have concluded that it was de novo wrong but the administrator has discretion).  In other words, if the administrator's decision was correct -- and we hold that it was -- we don't "defer" to it, we simply affirm it at step one.  We only "defer" to decisions that are different from the one we would have made.

B.

In the alternative, the employees seek the payment of SER benefits under 29 U.S.C. § 1132(a)(3), a catch-all remedial provision for ERISA beneficiaries that authorizes courts to offer "other appropriate equitable relief."  29 U.S.C. § 1132(a)(3).[4]  However, the employees' attempt to proceed on this theory is

---

[4] The provision says that a civil action may be brought

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such

21

barred by controlling precedent in <u>Ogden v. Blue Bell Creameries U.S.A., Inc.</u>, 348 F.3d 1284, 1287–88 (11th Cir. 2003), and <u>Katz v. Comprehensive Plan of Group Insurance</u>, 197 F.3d 1084, 1088–89 (11th Cir. 1999).  In those cases, this Court held that plaintiffs cannot "plead and proceed" in the alternative under 29 U.S.C. § 1132(a)(3) when their appropriate remedy is offered by § 1132(a)(1)(B).  This is because, as the Supreme Court has made clear, § 1132(a)(3) is a "catchall" remedial provision that "provides relief only for injuries that are not otherwise adequately provided for by ERISA."  <u>Ogden</u>, 348 F.3d at 1287 (relying on <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 515 (1996)).

Section 1132(a)(1)(B) provides a private cause of action "to recover benefits due . . .  under the terms of [a] plan."  29 U.S.C. § 1132(a)(1)(B).  The essence of the employees' claims -- in both counts -- is that they were entitled to SER benefits but wrongfully denied them.  Thus, their lawsuit is "to recover benefits due . . . under the terms of [a] plan," precisely the injury for which § 1132(a)(1)(B) provides the remedy.  That the remedy they seek is not forthcoming in this case is a failure of fact, not a mismatch of theory.

---

violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

22

In any event, the employees cannot make out a successful claim for equitable relief.  As counsel conceded at oral argument, their alternative theory arises from the same factual circumstances as their first.  It too falls short for the same reasons that led us to reject their first claim.  Accordingly, we affirm.

**AFFIRMED.**