[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14737

Non-Argument Calendar

_____

TROY R. JACKSON,

Plaintiff-Appellant,

versus

CORIZON HEALTH, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:18-cv-01041-MMH-JBT

_____

Before BRANCH, LAGOA, and BRASHER, Circuit Judges.

PER CURIAM:

Troy Jackson, a *pro se* Florida prisoner, appeals the district court's grant of summary judgment in favor of Corizon Health, Inc., on his claim of deliberate indifference to his medical needs and failure to train medical staff in violation of the Eighth Amendment, and the dismissal without prejudice of his related state law claims. Jackson argues that summary judgment was improper because there are genuine issues of material fact for a jury to decide regarding (1) the timeline of events; (2) whether Corizon had a policy of requiring staff to receive a doctor's permission before transferring an inmate to an off-site hospital and avoiding hospital transfers in order to minimize medical care costs; and (3) whether Corizon had a policy of undertraining its staff. He also maintains that his state law claims should not have been dismissed. After review, we affirm.

## I.    Background

Corizon Health, Inc. ("Corizon") is a corporation that contracts with the Florida Department of Corrections to provide health care services in Florida's prisons. Jackson, a Florida prisoner, filed a *pro se* 42 U.S.C. § 1983 complaint against Corizon, asserting Eighth Amendment violations for deliberate indifference to his serious medical needs and a failure to train medical staff, as well as state law claims for intentional infliction

of emotional distress, medical negligence, and negligent hiring, retention, or supervision.[1] At the time of the events alleged in the complaint, Jackson was an inmate at Columbia Correctional Institute in Lake City, Florida. Jackson alleged that he suffers from chronic asthma and that, on June 27, 2015, at approximately 3:00 a.m., he began suffering shortness of breath. He notified Sergeant Roebuck that he was having trouble breathing, and Sergeant Roebuck contacted the prison's medical unit. Nurse Cynthia Lewis responded to the call and transported Jackson via wheelchair to the medical unit. Jackson's oxygen level registered as 82%. Therefore, at 3:30 a.m., Nurse Lewis administered a nebulized breathing treatment and a Solumedrol injection.

According to Jackson, approximately three minutes later, he went into respiratory failure and lost consciousness. At that time, Nurse Lewis panicked and exited the room without trying to revive Jackson. Officer Landig was on duty in the medical unit, and he ran after Lewis in an attempt to get her to return. Between 3:33 and 3:35 a.m., Officer Landig contacted the prison's control room and advised of Jackson's situation and that he needed immediate medical assistance. Jackson maintains that, during this time, Nurse Lewis was attempting to reach the physician on-call via phone, "presumably seeking instructions or permission to send [Jackson] to the outside Hospital Emergency

---

[1] We refer to the allegations in Jackson's second amended complaint which is the operative complaint in this case.

Room."

Sergeant Roebuck heard Officer Landig's message over the radio, and immediately headed to the medical unit. Upon arrival, he questioned Nurse Lewis about whether she intended to administer CPR, and Nurse Lewis said "No." Sergeant Roebuck began searching for an "Ambi-bag" and informed Nurse Lewis that Jackson would begin suffering brain damage if he was not revived. Sergeant Roebuck located the Ambi-bag and administered CPR to Jackson, who began breathing.

However, according to Jackson, at 4:08 a.m., he went into respiratory failure a second time, and once again Nurse Lewis refused to perform CPR, but Sergeant Roebuck administered CPR. At 4:13 a.m., Officer Landig called the control room and requested an ambulance. At some point during these events, Nurse Shiver entered the medical unit to assist.

At 4:27 a.m., the ambulance arrived. Paramedics intubated Jackson, who remained unconscious, and the paramedics transported him to a local hospital. The local hospital later ordered Jackson to be transferred to a hospital in Jacksonville, Florida, where he was placed in intensive care for two days. He was diagnosed with "severe asthma exacerbation, post acute hypercapnic respiratory failure with ventilator support, and hypertension." After his two-day stay in intensive care, the hospital discharged Jackson to North Florida Reception and Medical Center facility, where he stayed for a little over a week. Thereafter, he returned to Columbia Correctional Institute.

Jackson alleged that, upon his return, he spoke with

Sergeant Roebuck, Officer Landig, and Nurse Lewis about the events surrounding his medical crisis, and they conveyed the facts to him that served as the basis for his complaint.  Furthermore, Nurse Lewis explained that she did not perform CPR because her CPR certification had expired, and she did not want to be liable if something happened.  She also explained that

> [she] did not immediately send [Jackson] to the emergency room when [he] went into respiratory failure, because we are instructed to find alternative treatment options that [are] cost efficient then to send an inmate to an outside hospital, and if there's no other options available, to contact the on-call physician for approval to send an inmate to the hospital.

Jackson alleged that, as a result of the staff's inaction and the delay in treatment, he suffered a 50% reduction in his lung capacity and substantial memory loss.

Accordingly, Jackson argued that Corizon was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment because it had a custom, policy, or practice of requiring medical staff to receive permission from a physician before authorizing the transfer of an inmate to an off-site hospital even in emergency situations, and to seek alternative medical treatments in an effort minimize medical costs.  He also alleged that Corizon failed to properly train Lewis.  And he asserted several related state law claims for intentional infliction of emotional distress, medical negligence, and negligent hiring,

retention, or supervision.

In support of his claims, Jackson submitted (1) copies of his administrative grievances concerning the medical care he received on June 27, 2015; (2) the paramedic's prehospital care report; (3) Jackson's sworn affidavit attesting that he spoke with Sergeant Roebuck and that Sergeant Roebuck informed Jackson "that he (Roebuck) had to perform cardiopulmonary resuscitation ("CPR"), because . . . [Nurse Lewis] refused to do so, because she had to telephonically contact the on-site physician to get permission to send [Jackson] out to a hospital emergency room"; (4) an October 2016 article discussing issues with Corizon health services in prison facilities across the country; and (5) opinions or orders from several other cases that had been brought against Corizon.

Corizon moved for summary judgment, arguing that it had no policy limiting the authority of medical staff to make hospital transfers only to physicians or to avoid hospitalizations in order to save money.  Corizon noted that, after Jackson became unresponsive at 4:08 a.m., he was sent to the hospital by Nurse Shiver, not a physician.  Furthermore, he received the necessary medical care—a breathing treatment, medication, CPR, and then hospital transportation—which Corizon argued negated his deliberate indifference claim.  Corizon further argued that it could not be liable for failure to train because nothing in the record indicated a need for training or that Corizon was aware of any need for training.  Finally, Corizon maintained that summary judgment was also appropriate on Jackson's state law claims.

20-14737          Opinion of the Court          7

Jackson opposed the motion for summary judgment and submitted several exhibits in support of his claims.  As relevant to this appeal, those exhibits included (1) the paramedic's prehospital care report, which indicated that the paramedics received the emergency call at 4:14 a.m. on June 27, 2015, and they arrived at the prison at 4:27 a.m.; (2) the prison's form for Jackson's emergency transfer to an outside hospital, which was completed by Nurse Shiver, and indicated that (a) the time of event was 3:33 a.m. and that Jackson's condition upon arrival at medical was unstable, in respiratory distress, and unresponsive, and (b) the prison's physician was contacted at 3:56 a.m., and (c) 911 was called at 4:13 a.m.; (3) various medical records; (4) complaints against Nurse Lewis and her disciplinary record; (5) Lewis's training sheet documenting the topics Corizon provided training on and which trainings Lewis had completed; (6) Jackson's sworn affidavit attesting that Nurse Lewis told him that the reason why she did not immediately send him to the hospital was because "we are instructed to find alternative treatment options that [are] cost efficient, then to send an inmate to an outside hospital, and if there's no other options available[,] to contact the on call physician for approval to send an inmate to the hospital"; (7) a January 2015 sworn declaration from Dr. Charles Pugh (made as part of another case against Corizon), which addressed Dr. Pugh's experience as Corizon's Site Medical Director as a physician at the

Chatham County Jail in Savannah, Georgia, in 2013 and 2014;[2] and (8) Dr. Pugh's 2016 deposition from yet another case brought against Corizon in Georgia based on the medical care an inmate received while in the Chatham County Jail.

The district court granted Corizon's motion for summary judgment as to the deliberate indifference and failure to train counts. The district court found that Corizon was entitled to summary judgment because the record confirmed that there was no policy or custom that allowed only physicians to authorize an inmate to be sent to a hospital. Rather, the record demonstrated that all medical staff could send inmates to hospitals for emergency care. With regard to Corizon's alleged cost-cutting policy, the district court explained that Jackson's reliance on Pugh's declaration and deposition from other cases as evidence of this policy was misplaced because Pugh worked at a different prison and during a time period prior to the events in Jackson's case. The district court also noted that nothing precludes prison officials from considering costs when determining what type or level of medical care an inmate should receive as long as such

---

[2] Dr. Pugh stated that during his tenure, he was "required by Corizon to submit all physician consults and emergency room transfer requests to the Regional Medical Director," and he "was constantly under pressure from [his] superiors in Corizon to minimize emergency room treatments . . . for jail inmates in order to save money." He further asserted that "the company's constant efforts to reduce costs interfered with [his] ability, and with the staff's ability, to provide appropriate levels of care to inmates of the Chatham County Jail."

considerations do not deprive the inmate of minimally adequate medical care, which the record demonstrated Jackson received. Accordingly, because Jackson failed to provide any evidence that tended to demonstrate that Corizon had a custom, policy, or practice that only physicians could order hospital transfers or that such transfers are discouraged because of costs, Corizon was entitled to summary judgment on Jackson's deliberate indifference claim.

Similarly, the district court determined that Corizon was entitled to summary judgment on Jackson's failure to train claim because Jackson failed to present any evidence that Corizon had a policy not to train its staff or knew that there was a need to train its employees on how to initiate emergency inmate transfers to hospitals. Rather, the evidence established that Corizon had such training available, and the fact that Nurse Lewis may not have completed the training did not render Corizon liable. Finally, because all of Jackson's federal claims were due to be dismissed, the district court declined to exercise supplemental jurisdiction over Jackson's state law claims and dismissed those claims without prejudice. Jackson, proceeding *pro se*, appealed.

## II.    Discussion

We review the grant of summary judgment *de novo*, viewing the record and drawing all reasonable inferences in favor of the nonmoving party "to the extent supportable by the record." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (emphasis and quotation omitted). Summary judgment is

appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (alteration adopted) (quotation omitted). "Once the movant submits a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial. If the nonmoving party presents evidence that is merely colorable or not significantly probative, summary judgment is appropriate." *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017) (quotations and internal citations omitted). "We may affirm for any reason supported by the record, even if not relied upon by the district court." *Hill v. Emp. Benefits Admin. Comm. of Mueller Grp. LLC*, 971 F.3d 1321, 1325 (11th Cir. 2020).

## A. Medical Care Claim

Jackson argues that the district court erred in entering summary judgment in favor of Corizon on his deliberate indifference to his serious medical needs claim because there are genuine issues of material fact regarding whether Corizon had a custom, policy, or practice of requiring staff to receive physician permission before transferring an inmate to a hospital and to

avoid sending inmates to a hospital as a way of cutting costs.[3]  He maintains that there is a genuine issue of material fact concerning the existence of this policy based on (1) the fact that a physician was called on the night in question before Jackson was transferred to the emergency room; (2) Nurse Lewis's statement to him that she was instructed to contact a physician for approval to send an inmate to an outside hospital; (3) Dr. Pugh's statements that he was under pressure to minimize medical costs and to avoid sending prisoners to the hospital while a physician at the Chatham County Jail; and (4) the existence of other cases brought against Corizon based on similar allegations.  We disagree.

The Eighth Amendment prohibits "cruel and unusual punishments."  U.S. Const. amend. VIII.  The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners" constitutes cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  As a result, the Constitution requires governments "to provide minimally adequate medical care to those whom they are punishing by incarceration."  *Hoffer v. Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991)).  Thus, Jackson had to "show: (1) a serious medical need; (2) the

---

[3] Jackson also argues that there is a genuine issue of fact regarding the timeline of events and whether he went into respiratory failure once (as Corizon alleges) or twice (as he alleges).  For purposes of this opinion, we accept as true Jackson's timeline of events and the allegation that he went into respiratory failure twice.

defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quotation omitted).

Private entities, like Corizon, may be liable under § 1983 when they "perform[] a function traditionally within the exclusive prerogative of the state" such as providing medical services to persons to inmates. *Id.* (quotation omitted). Liability under § 1983 cannot be based on the theory of vicarious liability. *Id.* Thus, to prevail on his deliberate indifference claim against Corizon, Jackson had to prove that Corizon "had a 'policy or custom' of deliberate indifference that led to the violation of his constitutional right." *Id.*

"A policy is a decision that is officially adopted by the [entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [entity]." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). And "[a] custom is a practice that is so settled and permanent that it takes on the force of law." *Id.*; *see also Craig*, 643 F.3d at 1310 ("An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a[n] [entity] to liability on the theory that the relevant practice is so widespread as to have the force of law." (alteration adopted) (quotation omitted)).

Proof of a single incident of unconstitutional activity is not sufficient to demonstrate a policy or custom for purposes of § 1983 liability. *Craig*, 643 F.3d at 1310. Rather, a plaintiff must

establish the existence of a pattern of similar violations. *Id.* "In the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional." *Id.* at 1311 (alteration adopted) (quotation omitted).

In sum, to survive summary judgment, Jackson had to produce evidence sufficient to create a genuine dispute of material fact on each element of liability under § 1983: (1) that Jackson's constitutional rights were violated; (2) that Corizon had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that this policy caused the constitutional violation. *See id.* at 1310.

As explained further in this opinion, Jackson's claim fails because he failed to plead sufficient facts to establish the existence of a custom or policy or that the alleged policy caused the constitutional violation.

The fact that a physician was called on the night in question before Jackson was transferred to an emergency room does not establish the existence of the alleged custom, policy, or practice for a single incident "is insufficient to prove a policy or custom." *Craig*, 643 F.3d at 1311. Furthermore, the existence of such a policy or custom is belied by the form authorizing Jackson's transfer to an outside hospital, which expressly provides that "[i]f assessment is performed by health staff other than clinician, form must be reviewed and signed by a clinician on the next working day." Thus, the transfer form establishes that

someone other than a physician may authorize the transfer of an inmate to an outside hospital.

Moreover, Jackson's affidavit in which he asserts that Nurse Lewis told him that "we are instructed to find alternative treatment options that [are more] cost efficient th[a]n to send an inmate to an outside hospital, and if there's no other options available, to contact the on-call physician for approval to send an inmate to the hospital" does not create a genuine issue of material fact regarding Corizon's policy or custom because she never stated who gave her those instructions. Corizon may not be held liable for the acts of its employees unless it sanctioned the acts—either through a policy or custom. Nurse Lewis never stated who gave her the alleged instruction to contact a physician before transferring an inmate to an outside hospital. Therefore, we are left to speculate whether it was Corizon that gave her that instruction, a prison official, an administrative official, or someone else within the prison facility—all of these speculative inferences are equally plausible—and speculation is not sufficient to overcome summary judgment. *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (explaining that "[s]peculation does not create a *genuine issue* of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment").

And regardless, even assuming that Nurse Lewis's statements could establish a custom or policy attributable to Corizon, Jackson's claim that this alleged custom or policy resulted in a constitutionally inadequate delay in medical care that

caused him injury rests only on his experience, which is, at most, proof of "a single incident of unconstitutional activity." *Craig*, 643 F.3d at 1312 (quotation omitted). He produced no other evidence of similar incidents at Columbia Correctional.[4] The standard for holding a municipality liable under § 1983 is high, and proof of a single incident "is not sufficient to impose liability." *Id.* (quotation omitted).

Moreover, we note that Jackson failed to establish causation between the alleged custom or policy and his injury. Specifically, Jackson alleged that the policy or custom caused a delay in medical treatment that resulted in his alleged lost lung capacity and memory loss. However, he produced no medical evidence demonstrating that the injuries he suffered were the result of delayed treatment. *See Hill v. Dekalb Reg'l Youth Det.*

---

[4] Dr. Pugh's affidavit and deposition from different lawsuits against Corizon are insufficient to create a genuine issue of material fact as to the existence of the alleged policy, custom, or practice because Jackson was never an inmate at the Chatham County Jail in Georgia where Dr. Pugh worked. Thus, even assuming the truth of Dr. Pugh's statements, there is no evidence that Corizon exhibited the same pressure on physicians at Columbia Correctional Institute where Jackson was an inmate. Furthermore, Dr. Pugh's statements concern a time period prior to Jackson's experience. Thus, any relation between Dr. Pugh's statements and Jackson's case is speculative at best, which is insufficient to defeat summary judgment. *Cordoba*, 419 F.3d at 1181. For these same reasons, the existence of other lawsuits against Corizon involving the provision of medical services to inmates in *other jails and prisons* does not create a genuine issue of material fact as to the existence of the alleged policy, custom, or practice at Columbia Correctional Institute. *Id.*

*Ctr.*, 40 F.3d 1176, 1187–88 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002) (explaining that when a plaintiff alleges that delay in medical treatment constituted deliberate indifference, he "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed").

Accordingly, because Jackson failed to make a showing sufficient to establish the existence of elements essential to his case, Corizon was entitled to summary judgment on his deliberate indifference claim.

### B. Failure to Train Claim

Jackson alleged in his complaint that Corizon was liable for its failure to train Nurse Lewis on the emergency transfer inmates. Jackson argues that the district court erred in entering summary judgment on his failure to train claim because there was a genuine issue of material fact as to whether Corizon had a policy of not requiring or insuring that its staff completed the required training as evidenced by the fact that Nurse Lewis failed to complete Corizon's training course on emergency transfer procedure.

Like a municipality, a private entity such as Corizon, may be liable for failing to train its employees if "such inadequate training can justifiably be said to represent [the entity's] policy." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). "Since [an entity] rarely will have an express written or oral policy of inadequately training or supervising its employees, . . . a plaintiff

may prove [an entity's] policy by showing that the [entity's] failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The failure to train must "reflect[ ] a 'deliberate' or 'conscious' choice by a municipality." *Canton*, 489 U.S. at 389. "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the [entity] knew of a need to train and/or supervise in a particular area and the [entity] made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. "A municipality's [or entity's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quotation omitted).

Here, the record established that Corizon offered training courses on "emergency transfer to outside hospital," which undermines Jackson's contention that Corizon had a custom or policy of undertraining its staff. Although Nurse Lewis may not have completed the training, there is no evidence that Corizon was aware that Nurse Lewis had not completed the course or that other medical staff members had not completed this training. Furthermore, Jackson failed to produce any evidence of similar constitutional violations by other employees at Columbia Correctional, and "[a] pattern of similar constitutional violations

by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.*

Although Jackson submitted Nurse Lewis's disciplinary record, those incidents reflect that she was disciplined primarily for time and attendance issues. Only one documented disciplinary incident relates to Nurse Lewis's medical care, where Nurse Lewis was given written counseling after another nurse complained that Nurse Lewis failed to help during a medical emergency. The fact that Nurse Lewis was disciplined for her inaction demonstrates that Corizon did not have a policy of undertraining its staff or "deliberate[ly] cho[se] not to take any action" when it became aware of issues. *Gold*, 151 F.3d at 1350 ("To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."); *see also Keith v. Dekalb Cnty.*, 749 F.3d 1034, 1053 (11th Cir. 2014) (determining that a single prior incident did not provide the requisite notice to the supervisor that the training provided was constitutionally deficient). Accordingly, Jackson failed to make a showing sufficient to establish a failure to train claim, and Corizon was entitled to summary judgment.

C. Jackson's state law claims

Finally, because summary judgment was appropriate on Jackson's federal § 1983 claims, the district court did not abuse its

discretion in declining to exercise supplemental jurisdiction over the state law claims. *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 738, 743 (11th Cir. 2006) (explaining that the district court's decision not to exercise supplemental jurisdiction is reviewed for an abuse of discretion, and that, under 28 U.S.C. § 1367, district courts may decline to exercise such jurisdiction when "[it] has dismissed all claims over which it has original jurisdiction"); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

Accordingly, we affirm the district court's grant of summary judgment for Corizon.

**AFFIRMED.**